(No. 75541.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DOUGLAS E. OAKS, Appellant.

*Opinion filed February 15, 1996.—Rehearing denied April 1, 1996.*

414

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Larry S. Vandersnick, State's Attorney, of Cambridge (Rosalyn Kaplan, Solicitor General, and Arleen C. Anderson and Kathy Shepard, Assistant Attorneys General, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

Following a jury trial in the circuit court of Henry County, Douglas E. Oaks was convicted of two counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a)(2), (a)(3)) and one count of aggravated battery of a child (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.3(a)) for the death of his girlfriend's three-year-old son. Defen-

dant waived his right to a jury at the death penalty hearing. The trial court found defendant eligible for the death penalty because the victim was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(7).) The trial court also found that no mitigating factors existed sufficient to preclude imposition of the death sentence (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(h)), and sentenced defendant to death on the two murder counts. Defendant's aggravated battery of a child conviction was vacated as a lesser included offense of the murder convictions. The sentence was stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).

On appeal to this court, defendant argues that: (1) the murder and aggravated battery indictments issued against him are duplicitous and void; (2) the statements he made to police should have been suppressed at trial, because they were involuntarily given as the result of promises made to him by his interrogators, and his written statement was taken in violation of his fifth amendment right to counsel; (3) he was denied a fair trial where the State introduced evidence of prior injuries to the victim without establishing that defendant had inflicted them; (4) he was not proven guilty of murder because the State failed to prove beyond a reasonable doubt that he knew shaking a child could cause death or great bodily harm or would create a strong probability of death or great bodily harm; (5) he was denied a fair trial where the State elicited testimony from a pediatrician that the victim's injuries could not have been caused accidentally but must have been caused intentionally; (6) he was denied due process where the involuntary manslaughter instructions informed the jury that it was the State's burden to prove defendant's guilt of that offense; (7) his waiver of a sentencing jury was

not knowing and intelligent because the trial court did not tell him that any one juror could preclude a death sentence; (8) his death sentence should be vacated because the sole eligibility factor was not established where the murder was not exceptionally brutal or heinous and indicative of wanton cruelty; (9) the sentencing court relied on a facially vague statutory aggravating factor, that the murder was accompanied by brutal or heinous behavior indicative of wanton cruelty, at both stages of the death penalty hearing; (10) the sentencing court erroneously rejected a psychiatrist's conclusion that defendant had acted under an extreme emotional disturbance when he killed the victim; (11) the sentencing court violated his constitutional rights by refusing to allow him to make a statement in allocution; (12) the Illinois death penalty statute is unconstitutional; and (13) his felony murder conviction and sentence must be vacated because the sentencing court imposed the death penalty for both felony murder and knowing murder though only one person was killed.

In the guilt phase of the trial, the State introduced, *inter alia*, the following evidence. Michael Weis, a volunteer paramedic for the Cambridge Ambulance Service in Cambridge, Illinois, testified that he and two other emergency medical technicians responded to a 9-1-1 call received at approximately 1:49 p.m. on July 29, 1992. Upon their arrival at an apartment in the Fieldcrest complex in Cambridge, they discovered the three-year-old male victim, Jerry Nelson, lying face down on the floor. Although he had a strong heartbeat, the victim was not breathing and his eyes were fixed and dilated. Weis stated that after he suctioned out the victim's airway in the ambulance, a bloody mucus flowed from his mouth. En route to the hospital, Weis noticed a large bruise on the victim's groin and more bruises on his chest and underneath both arms. The

bruises ranged in color from light red to very dark purple and bluish. Weis also noticed a small laceration or abrasion above the left eye, in the hairline. Upon arrival at Hammond-Henry Hospital in Geneseo, Illinois, at around 2:10 p.m., the victim's condition remained unchanged. Weis testified that when he saw the victim several hours later, more bruises were showing up and the lighter bruises were becoming darker.

Paul Rudy, a physician at Hammond-Henry Hospital, testified that he was working in the emergency room when the victim arrived by ambulance on the afternoon of July 29. Dr. Rudy stabilized the victim by maintaining artificial respiration and then questioned the victim's mother, Tonya Nelson, as to what had happened. Dr. Rudy stated that Tonya's responses and behavior were "totally inappropriate," and that she had given him "a couple different stories," saying that the victim had slipped on a blanket in the bedroom and fallen and hit his head on a dresser and that his bruises were caused when he slipped the previous day and hit his chest on the toilet stool in the bathroom. Dr. Rudy identified photographs that he requested be taken in the emergency room of bruises on the victim's chest, groin and abdomen. Because a brain injury was suspected, a CAT scan was ordered, which showed bleeding in the victim's brain. X rays also showed a fracture of the victim's right clavicle, or collarbone. Because a neurosurgeon was needed, Dr. Rudy arranged for the victim's transport by helicopter to Iowa City, Iowa. Dr. Rudy testified that his diagnosis of the victim was battered child syndrome, noting that the injury shown by the CAT scan "did not happen because he slipped on his blanket in the bedroom." Dr. Rudy further stated that the broken clavicle and bruises were fairly recent injuries and that the broken clavicle would be quite painful, but that when a brain injury or subdural

hematoma occurred, the victim "might become immediately unconscious and *** wouldn't feel anything."

Sheryl Ranos, a special agent with the Illinois State Police, Division of Criminal Investigation, testified that she received a call from her superior officer at approximately 9:45 p.m. on July 29, advising her that there was a three-year-old child at Iowa City Hospital presumed brain dead and that she was to meet with Dee Shannahan of the Department of Children and Family Services (DCFS) and Henry County Detective Jerry Hamilton and assist in the investigation. After being advised that defendant was in Bettendorf, Iowa, and may have been responsible for the victim's injuries, Ranos, Hamilton and Shannahan decided to go to Bettendorf and speak to defendant. Hamilton and Shannahan went to the residence of Darlene and Fritz Schlitter, defendant's grandparents, and requested to speak with defendant. Defendant voluntarily accompanied them to the Bettendorf police department, arriving at approximately 11:30 p.m. Ranos testified that she, Hamilton and Shannahan interviewed defendant after he was advised of his *Miranda* rights. Thirty to 40 minutes into the interview, which began at approximately 11:45 p.m., Ranos left the interview room and discovered that the interview was being videotaped, which is routinely done by the Iowa authorities. The interview was completed at approximately 1:30 a.m. and Detective Hamilton then began to take a written statement from defendant. Shortly after 2 a.m. on July 30, Ranos, Shannahan and Hamilton left the Bettendorf police department and went to the hospital in Iowa City to view the victim and to speak to Tonya Nelson and the doctors. Ranos stated that the victim was unconscious and on a life support system and that she observed bruises on his stomach, chest, groin, arms, wrists, ankles and head.

The videotape of defendant's interview with Ranos,

Hamilton and Shannahan was admitted into evidence and played for the jury. The transcript of that videotape reflects that defendant was told that he was not under arrest, but was read his *Miranda* rights and stated that he understood them. Defendant stated that he arrived at Tonya Nelson's apartment at about 11:30 p.m. on Monday, July 27, 1992, and did not leave until shortly after the victim was injured about 1:17 p.m. on Wednesday, July 29. Defendant initially denied that he had injured the victim, stating he thought the injuries were caused when the victim slipped and hit his head while stepping out of the bathtub after defendant gave him a bath between 11 a.m. and noon on Tuesday. At that time, defendant noticed the victim's head looked a little bruised at the hairline on the left side. About 9 p.m. Tuesday night, the victim bruised his chest when he again slipped in the bathroom and hit the toilet. Tonya was in the living room at the time of both these bathroom falls. Defendant further stated that at about 1 p.m. on Wednesday, July 29, the victim fell over while picking up a bowl of popcorn on the floor. The victim repeatedly called for his mother, who was in the bathroom, but would not say anything else and would not sit up. Defendant stated that he believed the victim was "having a seizure," and told Tonya to get dressed. He left after he saw Tonya enter a neighbor's apartment to use the phone to call for help.

After Detective Hamilton told defendant that his story was inconsistent with the nature and extent of the victim's injuries, defendant stated that the right side of the victim's head may have grazed the television stand when he fell while reaching for the popcorn bowl, and that defendant then picked him up, and seeing that he was all right, playfully tossed him in the air two or three times. The last time, the victim caught the edge of the couch coming down and landed on a mattress in front of

the couch, hitting his head and shoulder hard. When defendant was again told that his story was inconsistent with the victim's injuries, he stated that when he missed catching the victim, he hit the couch and then the floor. The victim then stood up and wet his pants. Defendant became angry, grabbed the victim and threw him sideways towards the mattress. The victim's head and shoulder missed the mattress and struck the floor; he got up on all fours, turned onto the mattress and put his head down.

Defendant further admitted in his videotaped statement that when he grabbed the victim and threw him he "probably did squeeze him hard 'cause I was angry." Defendant then admitted that when the victim put on his shorts the wrong way after his bath on Tuesday, July 28, defendant "got a little mad and I gave him a good biff up sideway of the head and he fell into his bed, the metal edge of his bed." At the conclusion of the interview, defendant was told that he should consider himself in custody and under arrest. Defendant was again given *Miranda* warnings and asked by Hamilton to make a written statement. Defendant replied, "I don't know. Should I see a lawyer?" After some discussion with Hamilton, defendant agreed to make a written statement. However, after briefly answering Hamilton's questions, defendant stated that he wished to stop. The interview was then terminated and the videotaping ended.

Dr. Theodore James Burke, a resident pathologist at the University of Iowa Hospitals, testified that he assisted in the autopsy of the victim performed on August 1, 1992. The external examination of the victim done at the autopsy revealed bruises or contusions on the head, chest, abdomen and back. More specifically, there was a contusion on the forehead, over the left eye, which had an abrasion running through it, and a fracture of the

victim's clavicle on the right side. The internal examination revealed a blood clot on the surface of the brain, hemorrhaging on both sides of the brain and "massive swelling of the brain such that the normal anatomical foldings of the brain were all distorted." Dr. Burke explained that "[t]he brain was attempting to \*\*\* ease down \*\*\* into the openings where the spinal cord comes up through and connects with the brain." Dr. Burke testified that it was this herniation of the brain which was the ultimate cause of the victim's death. An examination of the inside of the brain revealed a number of injuries related to the recent trauma and a specific injury to the cerebellum that had occurred between two to six weeks prior to the acute injuries. Other acute injuries included the fractured clavicle and hemorrhages to the small bowel mesentery and adrenal gland, located in the abdominal area. An old hemorrhage to the adrenal gland, received approximately two to six weeks prior to the victim's death, was also found. Dr. Burke stated that the recent injuries to the head, adrenal gland, small bowel and clavicle could have occurred near the same time, but may not all have been part of the same incident. Dr. Burke estimated the victim's bruises were two to seven days old and therefore could have occurred on July 27 through 29, while the old injuries to the cerebellum and adrenal gland could have occurred in mid-June. Dr. Burke testified that the victim's acute injuries were very unlikely to have occurred from the child's falling down or against something, but rather were the result of significant trauma, as when someone is thrown or hit with great force.

Dr. Michael Hart, a neuropathologist at the University of Iowa Hospitals, testified that he assisted at the victim's autopsy by evaluating the brain injury. Dr. Hart believed the cause of death to be severe swelling of the brain due to recent injury by a force of considerable

magnitude. The extent of the injury seen in the victim's brain was consistent with a child's falling from the top of a seven- to nine-foot stepladder and striking his head on a concrete surface, but not consistent with a child's striking his head on a toilet, bathtub or television stand, nor with a child's being thrown onto a mattress or rug. Dr. Hart stated that due to the magnitude of the injury, the victim's head had to be struck against a hard object. Dr. Hart explained that the victim's death resulted when the swelling of the brain caused its migration down and backwards which compressed those portions of the brain that control respiration and cardiac functions. The autopsy examination also showed a previous injury to the victim's cerebellum which Dr. Hart estimated was between three and six weeks old, making it consistent with an injury that occurred June 22. Dr. Hart believed the victim's fatal brain injury to have been caused by blunt trauma to the head, but testified that it was very difficult to determine whether the victim would have become unconscious right away.

Patricia Vickroy testified that she was a resident and employee of Fieldcrest Village Apartments in Cambridge, Illinois. Vickroy stated that on the afternoon of Sunday, July 26, the victim came to her apartment to play with her daughter and "appeared to be fine." Although Vickroy did not look under the victim's clothes, she examined him fairly closely and did not notice any bruises or marks.

Debbie Kappelman, defendant's cousin, testified that she first met Tonya and Jerry Nelson in June 1992 at the home of her mother, Linda Johnson, in Coal Valley, Illinois. Defendant, Tonya and the victim had come to stay with her mother while her father was in Romania. Kappelman stated that at that time the victim looked malnourished, with a gray skin tone and "dark circles for his eyes." Kappelman testified that on June 22, she

went to spend the night at her mother's home. That evening, defendant took the victim upstairs to give him a bath, while she, her mother and Tonya remained downstairs. Shortly thereafter, Kappelman heard the victim babbling and heard defendant saying "Jerry, Buddy, what is the matter." Kappelman and her mother were half-way up the stairs when defendant opened the bathroom door and called for Kappelman. Kappelman stated that when she went into the bathroom, the victim was sitting up in the bathtub "Indian style," and "he wasn't making any sense." Kappelman further testified: "[H]e was saying I, I, I, cause, cause, cause and his eyes were kind of fluttery, you know, and I noticed he had a bit of a bowel movement in the tub so at that time I thought he had had a seizure." After defendant took the victim from the tub, Kappelman felt his body and he was very warm, so they took his temperature. The thermometer showed 105 degrees so Kappelman called the emergency room and they took the victim to St. Luke's Hospital in Iowa. At the hospital, Kappelman saw two bright purple bruises next to the victim's penis and one or two older bruises on his back. After the victim was examined and released, Kappelman, defendant, Tonya and the victim returned to Coal Valley. The next day, June 23, Kappelman took Tonya and the victim to see his physician, Dr. Nagendra.

Kappelman further testified that on June 30, Tonya and the victim came to stay at her home in Cambridge until arrangements could be made for Tonya to obtain low-income housing at the Fieldcrest apartments. During the 10 to 14 days Tonya and the victim stayed with Kappelman, she did not observe any injuries to him. Kappelman testified that although Tonya never slapped or hit the victim, "[s]he was afraid to do anything," because the victim was the subject of an on-going child abuse investigation.

Dr. B.N. Nagendra testified that he was the victim's pediatrician since his birth on November 21, 1988. Dr. Nagendra saw the victim for a cold and ear infection in January 1992 and did not note any unusual findings. Dr. Nagendra next saw the victim on June 23, 1992, as a follow-up to the victim's emergency room visit the previous evening. Dr. Nagendra testified that although the victim was taken to St. Luke's Hospital with a history of shaking and a fever of 105 degrees, when he arrived at the hospital, his temperature was 100 degrees, which is well within the normal range. On June 23, the victim's temperature registered a normal 98.3 degrees, but Dr. Nagendra scheduled a brain wave test, or electroencephalogram (EEG), to determine whether the victim could have had a seizure the night before. Tonya then asked that Dr. Nagendra check the victim's penis and genital area, explaining that he had fallen off a teeter-totter. Dr. Nagendra testified that on June 24, after receiving the report from the victim's emergency room visit, he called the Department of Human Services because he believed it suspicious that the victim was fine the day after supposedly having a 105 degree fever and because the bruises and abrasions he noted on the victim's groin and the head of his penis were not consistent with falling off a teeter-totter. On July 2, Dr. Nagendra saw the victim as a follow-up to another emergency room visit. At that time, the contusions and abrasions on the victim's genitals had healed and he appeared to be in good health. On July 4, Dr. Nagendra received the results of the victim's EEG, which showed no abnormal brain wave activity.

Fern Harper, Tonya Nelson's sister, testified that Tonya began dating defendant in mid-February 1992. Sometime in late February, Harper was playing Monopoly with the victim, Tonya and defendant and witnessed defendant become upset with the victim and

punch him in the knee. Harper stated that she and Tonya lived at their grandmother's home with the victim, but that Tonya left with him on June 10 or 11 and went to stay with a relative of defendant. Tonya and the victim returned on June 23 and the next evening Harper noticed bruises on his stomach and groin area and cuts on his penis when she gave him a bath. Later that night, she saw a bruise in the shape of a handprint on his back. On the afternoon of June 26, Harper accompanied Tonya and the victim, among others, to St. Luke's Hospital, where the victim was examined by a doctor. On June 30, Tonya took the victim and went to Cambridge, Illinois, and Harper did not see him again until July 29 at the hospital in Iowa City. Harper testified that she had previously pled guilty to the fraudulent use of a credit card.

Richard Vermeer, an emergency room physician at St. Luke's Hospital in Davenport, Iowa, testified that on June 26 he was asked by Tonya Nelson and Fern Harper to do a physical examination of the victim. Dr. Vermeer's examination revealed abrasions on the upper pull of both ears, five contusions on his back and two on his ribs that were approximately two weeks old, two purple contusions on his left lower abdomen, and two abrasions on his penis which were a few days old. The victim also had several large brown contusions on his buttocks. Dr. Vermeer made a diagnosis of suspected child abuse, and testified that although some of the victim's bruises could have been accidentally caused, he believed the injuries to the victim's penis were adult bite marks. Dr. Vermeer stated that it would be "very difficult" for a teeter-totter to have caused the injury to the victim's genitals and felt that the bruises on his buttocks were consistent with a spanking received up to two weeks before.

Robert Folberg, a pathologist and ophthalmologist

at the University of Iowa Hospitals, testified that he performed a study of the victim's eyes following their removal at the autopsy. Dr. Folberg found retinal hemorrhages and blood surrounding the optic nerve in both eyes and stated that these findings were consistent with trauma. Dr. Folberg believed it unlikely that the victim's eye injuries were caused accidentally because a study of children three years and under suffering accidental head trauma found none who showed evidence of retinal hemorrhages. Dr. Folberg further testified that the presence of blood surrounding the optic nerve and within the white of the eye was consistent with a violent shaking that occurred within several days of the victim's death. Although retinal hemorrhages could be caused by other types of trauma, Dr. Folberg testified that the autopsy results, "exclude a natural cause for the formation of these hemorrhages *** and a violent shaking is one explanation for what happened."

Lori D. Frasier, a pediatric physician, testified as a child abuse expert for the State. Dr. Frasier examined the victim on July 30, 1992, in the pediatric intensive care unit at the University of Iowa Hospitals in Iowa City. The victim was comatose and was attached to a respirator. Dr. Frasier reviewed the victim's medical records, examined his X rays and CAT scans for internal injuries and observed multiple bruises to the victim's forehead, jaw, chest, back, inner arms, forearms, abdomen, and groin. Dr. Frasier also observed an area of localized hair loss on the back of the victim's head, which she stated was likely to be caused by "someone yanking on his hair and pulling it out." Dr. Frasier stated that the cause of these injuries was "shaken/ impact syndrome meaning in the course of shaking there is also an impact against something," and that these injuries were intentional and not accidental.

Dr. Frasier further testified that the victim's injuries

were not consistent with those of a child who was thrown into the air and missed being caught, hitting his head and shoulder on a couch, nor would they be consistent with a 5 foot, 11 inch, 164-pound man tossing a 3 foot, 5 inch, 35-pound child onto a mattress and partially missing it. Dr. Frasier stated: "[T]here is no way *** that serious of a brain injury, that extent of bleeding, retinal hemorrhages and the kind of trauma that we saw to the external part of this child's body could have been caused by that scenario that you described to me." Dr. Frasier believed that the victim was shaken and either struck against or with a hard object and that his small bowel injury was caused by blows to the abdomen. She testified that following these injuries, the victim would be unconscious very quickly, within a matter of minutes, if he was conscious at all. In Dr. Frasier's opinion, Jerry Nelson was the victim of on-going child abuse.

Wilbur L. Smith, a professor in pediatrics and radiology at the University of Iowa Hospitals, testified as an expert in the area of child abuse. Dr. Smith reviewed the victim's CAT scans and X rays and consulted with the doctors who treated him. Dr. Smith stated that the victim died of a massive head injury caused by acute trauma to his brain equivalent to that experienced by an unrestrained child in a 35- to 40-mile-per-hour car accident or by a child who fell from at least three stories onto concrete. Dr. Smith agreed that the victim's injuries were not consistent with a fall against a toilet, a television stand, or a fall after being tossed in the air and hitting one's head on a couch or being tossed onto a mattress and hitting one's head on the floor. Dr. Smith testified that a single, direct blow trauma would not cause retinal hemorrhages like those suffered by the victim and that there had to be a shaking as well as at least one major impact to account for his injuries.

Dr. Smith further testified that the type of shaking involved herein

> "is not the type of shaking that can be done by tossing up in the air or playfully jostling on the knee ***, the shaking is a violent to and fro shaking which results in, first of all, tearing the layers of the brain apart, tearing the blood vessels over the top of the brain so that there is bleeding, tearing the blood vessels in the back of the eyes to cause the retinal hemorrhaging."

Dr. Smith opined that the victim's injuries were not caused by accidental means because even throwing a child across the room, as defendant's statement described, would not generate enough force. Dr. Smith stated: "This is not [a] playful or, or even a minor accident type injury. *** This is a huge injury that is a fatal injury that knocked this child out immediately." In Dr. Smith's opinion the injuries to Jerry Nelson were the result of child abuse.

The defense presented evidence, *inter alia*, as follows. Patricia Oaks, defendant's mother, testified that she was present at her father's home in Bettendorf, Iowa, on June 21, 1992, and saw the victim swinging on a glider swing. Ms. Oaks next saw the victim on the ground "screaming and crying." She testified that although she did not observe any injuries to the victim, her two granddaughters had been pinched in the groin by sliding forward on the glider swing.

Linda Johnson, defendant's aunt, testified that on June 14, 1992, when the victim, Tonya and defendant came to stay at her home, the victim appeared listless, had dark circles under his eyes and a round spot of hair missing on the back of his head. On June 19, defendant told her that the victim had a sore penis and when she examined it, it appeared red. During the victim's nine-day stay at her home, Johnson did not notice any bruises on the victim. When she returned from shopping on the evening of July 29, defendant was at her home. Having

learned the extent of the victim's injuries, she informed defendant and he became pale and looked as if he were going to faint. Defendant did not volunteer an explanation for the victim's injuries, but when she asked, defendant said the victim had fallen in the shower on July 28 and mentioned an incident with the toilet. Johnson stated that during their stay at her home, defendant provided for most of the victim's bathing and toilet needs. One morning she went to her basement and found defendant and the victim waiting while the victim's underwear was being dried in the dryer. The victim had been crying and defendant stated that he had fallen on the cement in the basement.

Connie Bowers, a friend of Tonya Nelson, testified that on several occasions she observed Tonya become angry with the victim. Tonya yelled and swore at the victim and once grabbed him by the shoulders but did not shake him hard. Bowers stated that she never saw any bruises on the victim, nor did she see Tonya injure him in any way.

Dee Shannahan, a child protective investigator for DCFS, testified that around July 1, 1992, she received a report of suspected child abuse or neglect involving the victim which had occurred in late June. Shannahan and James Padilla, an investigator for the Henry County sheriff's department, interviewed Tonya and the victim, but found no indication of abuse. They interviewed Tonya and the victim again on July 6 and interviewed defendant on July 6 and 8. Shannahan stated that because the alleged abuse had occurred 10 to 11 days prior to their first observation of the victim, his bruises could have healed. Padilla testified that the investigation was closed because of lack of evidence.

Defendant testified that he was 26 years old and resided with his grandparents in Bettendorf, Iowa. Defendant stated that he did not remember becoming

angry at the victim or hitting him while playing Monopoly with Tonya Nelson and Fern Harper in February 1992. Defendant stated that after a three-week absence, he saw the victim on June 4, 1992, and that "Jerry was not the same person he was the last time I seen [*sic*] him." Defendant described the victim as withdrawn, quiet, and very timid with dark circles under his eyes. Defendant testified that on June 6 Fern Harper told him that the victim was complaining about a sore penis and asked if he knew what may have caused it. On June 14, defendant, Tonya and the victim went to stay with defendant's aunt. On Father's Day, June 21, the three were at defendant's grandmother's home when he heard a child scream, ran outside and learned that the victim had fallen off a glider. On June 22, defendant was giving the victim a bath and ran downstairs to get a washcloth. Defendant stated that when he returned to the bathroom, "Jerry was laying on his back in the bathtub with his head down by the faucets *** and he sat up immediately *** and he started to babble." Defendant called for his cousin when the victim continued to babble, sitting with his head back and his eyes fluttering. Defendant denied hitting or striking the victim or doing anything to injure him during the time they were at his aunt's home.

Defendant further testified that he went on vacation with his grandparents from June 24 through July 5, 1992. He again stayed with Tonya and the victim at his aunt's home from July 13 through 16. Defendant stated that on the morning of July 16, he and the victim came into the basement after swimming and the victim stepped into a drain in the linoleum floor and fell, hitting the back of his head. The victim was crying but seemed all right and stopped crying shortly before defendant's aunt came into the room. Tonya and the victim moved to an apartment in Cambridge on the afternoon of July 16.

Defendant testified that he arrived at Tonya's apartment between 11:30 p.m. and midnight on July 27, 1992. On the morning of July 28, he gave the victim a bath and noticed a bruise on his hip and three in the lower chest and upper abdominal area. The victim slipped while getting out of the bathtub and struck the left side of his head, but did not cry. Defendant noticed a bruise starting to form along the victim's hairline on the left side. The victim then went into his bedroom to dress, but began putting his shorts on the wrong way. Defendant testified that he "biffed him in the back of the head saying, 'Come on, Jerry. You know how to do it.' " Defendant stated that although he did not intend to hurt the victim or to knock him down, the victim lost his balance and fell into the side of his cot, hitting his chest along the metal edge. Defendant testified that the victim then drank a glass of water and vomited, and could not keep food down. After sleeping most of the day, the victim had some dinner. Around 9 p.m., the victim went into the bathroom and slipped on the wet floor, striking the toilet and "bouncing the back of his head off the floor."

Defendant stated that on the morning of July 29, 1992, the victim "flinched" when he walked by his mother in the hallway. Defendant began to cook breakfast while Tonya took a shower. Defendant asked the victim to get a popcorn bowl, "and when he bent over to pick it up, he just fell forward into it with his hands, and *** it looked like he could have grazed the dresser that they were using as a TV stand." After that, defendant was "horsing around" with the victim, tossing him in the air, and failed to catch him. The victim came down and his head hit the arm of the couch, but he appeared to be all right so defendant returned to the kitchen. Defendant testified that the victim then stated he had wet his pants and defendant became angry,

picked the victim up and threw him onto the mattress in front of the couch with his head and upper body hitting the floor. The victim began crying and "come [*sic*] up on all fours and crawled into the middle of the mattress, \*\*\* looked around the room and went down into a fetal position." Defendant picked the victim up and sat him on the counter, but the victim could not speak and then went limp. Defendant took the victim into the bathroom and got Tonya out of the shower. Defendant testified that the victim was moaning and his fingers and lips were turning blue, so he told Tonya to call 9-1-1 for help. Tonya took the victim and went to a neighbor's apartment to use the phone.

Defendant stated that he did not think he would be able to ride with Tonya and the victim in the ambulance, so he went to his cousin's home to get a ride to the hospital. Because his cousin's car was gone, he began to walk to his aunt's home in Coal Valley. After arriving there, defendant tried to reach Tonya at the hospital, but was told he would have to wait until Tonya contacted him. Three or four hours later, his aunt returned and told him that the victim was seriously injured. Defendant then went to Bettendorf with his grandparents and found a message on the answering machine from Tonya. After speaking with her, defendant tried to get a ride to the hospital, but before he could do so the authorities arrived and he accompanied them to the police department. Defendant testified that he did not initially tell the authorities everything that had happened to the victim because he was scared. Defendant denied having shaken or punched the victim at any time on July 28 or 29 and denied ever intending to injure him.

On cross-examination, defendant admitted that when he left Tonya's apartment, the ambulance had not yet arrived, and that when he realized his cousin was not home, he did not try to get help anywhere else in

Cambridge. Defendant testified that he knew when he threw the victim onto the mattress he had hurt him, but stated, "I never thought it was possible that what I had done caused the extent of his injuries." Defendant further testified that Tonya had never hit her son.

Timothy Brian McDonald, a pediatric anesthesiologist and intensive care physician at the University of Illinois Hospital in Chicago, testified as a rebuttal witness for the State. Dr. McDonald stated that he reviewed the victim's medical records in order to render an expert opinion as to his cause of death, which he categorized as shaken/impact syndrome and battered child syndrome. Dr. McDonald testified that given the various injuries detailed in the autopsy, both recent and old, he believed the victim was subjected to "multiple episodes of forcible, blunt, violent force." Although some of the victim's bruises and brain injuries could have been caused by falling in the bathtub and from being tossed in the air and hitting the couch and floor, none of those injuries resulted in the victim's death. Additionally, the fatal injuries detailed in the autopsy report were inconsistent with a child's being tossed onto a mattress in the manner described by defendant in his videotaped statement, because of the amount of blunt trauma that would be necessary to result in the intestinal and retinal hemorrhages. Dr. McDonald testified that the broken clavicle and the injuries to the mesentery and the head occurred around the same time, and that the shaken/impact head injury which caused the fatal brain swelling occurred shortly before the victim stopped breathing.

The jury was instructed on the offenses of murder, involuntary manslaughter and aggravated battery of a child, and found defendant guilty of two counts of murder and one count of aggravated battery of a child. After defendant waived his right to a jury for sentencing purposes, the trial court found defendant eligible for the

death penalty based upon the evidence presented at the guilt phase. At the second stage of the sentencing hearing, the State presented evidence in aggravation that defendant had been arrested for drug possession in 1985, when he was 18. Defendant admitted that he had obtained the drugs, as well as several handguns, a knife, money and jewelry, when he had burglarized the home of a roommate's parents. Defendant was convicted of burglary and the drug charges were dismissed. In 1989, defendant resisted arrest after assaulting his girlfriend and breaking her arm. He was sentenced to one year in jail and ordered to undergo alcohol counseling. In 1990, defendant was arrested for public intoxication, disorderly conduct, and interfering with official acts. A treatment director at the Davenport Center for Alcohol and Drug Services testified that defendant had been admitted to their program in 1983, 1984, 1985, 1986, 1989 and 1992.

Defendant presented, as evidence in mitigation, *inter alia*, the testimony of Dr. Robert Chapman, a psychiatrist. Dr. Chapman stated that he reviewed "testimony, hospital reports, autopsy reports" and defendant's videotaped statements prior to examining him in person. Based upon this examination, Dr. Chapman testified that in his opinion defendant acted under the influence of an extreme emotional disturbance when he killed the victim. Dr. Chapman believed that abuse suffered by defendant as a child caused him to "snap" and abuse the victim. Dr. Chapman further testified that an adult who had been abused as a child could react violently to incidents that would seem insignificant to others, like the victim's wetting his pants. The trial court, in sentencing defendant, rejected Dr. Chapman's finding that there had been an extreme mental or emotional disturbance which would preclude imposition of the death penalty.

We first address defendant's contention that the indictment did not properly charge him with murder and aggravated battery of a child, and that the charges in the indictment are therefore void. Count I of the indictment charged:

"That on or about June through July 29, 1992, in Henry County, DOUGLAS EARL OAKS and TONYA NELSON committed the offense of

FIRST DEGREE MURDER

in that they, said Douglas Earl Oaks and Tonya Nelson, knowingly killed Jerry Nelson without lawful justification, by subjecting Jerry Nelson to physical injury or by creating a situation which subjected Jerry Nelson to physical injury, to wit: multiple trauma about the head and body, which would be likely to cause death or great bodily harm to said Jerry Nelson, in violation of Section 9—1(a)(2), Chapter 38, Illinois Revised Statutes."

Count II charged:

"That on or about June through July 29, 1992, in Henry County, DOUGLAS EARL OAKS and TONYA NELSON committed the offense of

FIRST DEGREE MURDER

in that they, said Douglas Earl Oaks and Tonya Nelson, knowingly killed Jerry Nelson without lawful justification in that, while committing a forcible felony, Aggravated Battery of a Child, in violation of Illinois Revised Statutes, Chapter 38, Section 12—4.3(2), knowingly caused great bodily harm to Jerry Nelson, a 3-year-old child, by subjecting Jerry Nelson to physical injury or by creating a situation which subjected Jerry Nelson to physical injury, to wit: multiple trauma about the head and body, in violation of Section 9—1(a)(3), Chapter 38, Illinois Revised Statutes."

Count III charged:

"That on or about June through July 29, 1992, in Henry County, DOUGLAS EARL OAKS and TONYA NELSON committed the offense of

AGGRAVATED BATTERY OF A CHILD

in that they, said Douglas Earl Oaks and Tonya Nelson,

persons over the age of 18 years, knowingly and without legal justification caused great bodily harm to Jerry Nelson, a child under the age of 13 years, by creating a situation which subjected Jerry Nelson to physical injury, to wit: multiple trauma about the head and body, in violation of Section 12—4.3(a), Chapter 38, Illinois Revised Statutes."

Prior to trial, defendant filed a motion to dismiss counts I, II, and III, alleging that these counts of the indictment did not charge an offense. During argument on the motion, defense counsel particularly objected to the phrase "creating a situation," stating that it was too vague to allow preparation of a defense. The trial court ordered the State to file a bill of particulars, and later denied defendant's motion to dismiss the indictment. A bill of particulars was filed on January 7, 1993, and alleged that the injuries had been inflicted at the residences of Tonya Nelson and Linda Johnson, that the recent injuries were believed to have occurred between July 27 and July 29, 1992, and that some injuries had been caused between February and June 1992.

Defendant argues that he cannot be convicted of "creating a situation" which permitted the injury to occur, because that phrase does not appear in the statutes proscribing murder or aggravated battery of a child. (See Ill. Rev. Stat. 1991, ch. 38, pars. 9—1, 12—4.3(a).) Defendant contends that while the charged forms of murder must be done knowingly, and aggravated battery of a child must be done intentionally or knowingly, under the indictment, a conviction for "creating a situation" could be based on reckless or negligent conduct. Because defendant made a timely objection to the charging instrument in the trial court, the appropriate standard on review is whether the indictments strictly comply with the pleading requirements of section 111—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par. 111—3). (*People v. Maxwell* (1992), 148

Ill. 2d 116, 135.) Section 111—3 provides that a charging instrument must specify the name of the offense, cite the statutory provision allegedly violated, set forth the nature and elements of the offense charged, specify the date and county of occurrence, and identify the accused. Ill. Rev. Stat. 1991, ch. 38, par. 111—3.

Our examination of the counts of the indictment reveals their compliance with the section 111—3 requirements. In particular, each of the three counts set forth the statutory elements for that offense. Count I alleged that defendant "knowingly killed Jerry Nelson without lawful justification," by performing acts which subjected him to physical injury, namely, "multiple trauma about the head and body, which would be likely to cause death or great bodily harm to said Jerry Nelson." (*Cf.* Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(2).) Count II alleged that defendant "knowingly killed Jerry Nelson without lawful justification in that, while committing a forcible felony, Aggravated Battery of a Child," defendant "knowingly caused great bodily harm to Jerry Nelson" by performing acts which subjected him to physical injury, "to wit: multiple trauma about the head and body." (*Cf.* Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(3).) Therefore, counts I and II properly charged that defendant knowingly and actively caused the victim's death without lawful justification. Count III similarly followed the statutory language defining the offense of aggravated battery of a child in charging that defendant "knowingly and without legal justification caused great bodily harm to Jerry Nelson, a child under the age of 13 years," namely, multiple trauma about the head and body. Compare Ill. Rev. Stat. 1991, ch. 38, par. 12—4.3(a).

Although defendant claims that the indictment impermissibly allowed his conviction for failure to act, we believe the "creating a situation" language to which

he objects refers only to the method or means by which defendant committed the crimes. As stated in the aggravated battery of a child statute and in case law interpreting the murder statute, the method of commission is not integral to these offenses and therefore it need not be specified in the charging instrument. (See Ill. Rev. Stat. 1991, ch. 38, par. 12—4.3(a); *Maxwell*, 148 Ill. 2d at 137.) Indeed, because the phrase "creating a situation which subjected Jerry Nelson to physical injury" is not a material element of the offenses, the allegation may be considered surplusage. (See *People v. Thomas* (1990), 137 Ill. 2d 500, 522.) Therefore, where all three counts followed the statutory language in setting forth the nature and elements of the offenses, they met the requirements of section 111—3, and the indictment properly charged defendant.

Defendant also claims that the murder and aggravated battery of a child counts in the indictment are duplicitous and void because each one alleges, in the disjunctive, two theories which could constitute the offense charged, citing *People v. Heard* (1970), 47 Ill. 2d 501, *People v. Capitol News, Inc.* (1990), 137 Ill. 2d 162, and *People v. Eagle Books, Inc.* (1992), 151 Ill. 2d 235. First, contrary to defendant's assertion, the indictment against him was not duplicitous. Duplicity is the joinder of two or more distinct offenses in the same count of an indictment, and arises from charging more than one offense and not, as here, from charging a single offense in more than one way or pleading different acts contributing to the ultimate charged offense. *People v. Ross* (1961), 21 Ill. 2d 419, 420-21.

We also note that because defendant did not make this claim in the trial court, strict compliance with the requirements of section 111—3 is unnecessary. When the sufficiency of a charging instrument is challenged under section 111—3 for the first time on appeal, the

instrument will be upheld " 'if it apprised the accused of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecution arising out of the same conduct.' " (*Maxwell*, 148 Ill. 2d at 136, quoting *People v. Pujoue* (1975), 61 Ill. 2d 335, 339.) Although defendant contends that he was unable to prepare his defense because the acts alleged are disparate, *i.e.*, inflicting injuries on an individual or creating a situation which allowed injury to an individual, the authorities he cites do not support this argument.

In *Heard*, this court considered questions involved in charging a defendant in the disjunctive and concluded: "While a charge which follows the language of the statute defining the crime and uses the disjunctive 'or' will be sufficient under some circumstances, it will not be sufficient where the *statute* names disparate and alternative acts, any one of which will constitute the offense." (Emphasis added.) (*Heard*, 47 Ill. 2d at 504; see also *Eagle Books, Inc.*, 151 Ill. 2d at 244-45; *Capitol News, Inc.*, 137 Ill. 2d at 174.) Clearly, the murder and aggravated battery of a child statutes at issue here do not name disparate and alternative acts, any one of which would constitute the offense. Illinois law recognizes only a single offense of murder, which may be committed in a variety of ways. (*Maxwell*, 148 Ill. 2d at 137; see also *People v. Allen* (1974), 56 Ill. 2d 536, 543.) Similarly, the aggravated battery of a child statute states that the offense of causing great bodily harm to a child may be committed "by any means." (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.3(a).) Thus, where each of the charges merely "follows the language of the statute defining the crime" (*Heard*, 47 Ill. 2d at 504), we find that the use of the disjunctive did not prevent defendant from preparing his defense.

We next address defendant's contention that the

trial court erred in refusing to suppress his oral statements because they were involuntarily given as a result of promises made to him by his interrogators. Defendant's motion to suppress confession asserted, among other claims, that his confession was involuntary because "he was questioned by three representatives of law enforcement who badgered him into making the statement." The State argues that defendant failed to preserve this issue for review because his post-trial motion contained only the general objection that the trial court erred in failing to suppress the confession, citing *People v. Henderson* (1990), 142 Ill. 2d 258, 322. However, a claim of waiver is not well-taken in a capital case where the defendant has raised the point at trial but failed to include the specific issue in a post-trial motion, and where the defendant may raise the issue as a deprivation of a constitutional right in a post-conviction hearing. (*People v. Mitchell* (1992), 152 Ill. 2d 274, 325.) The trial court's failure to suppress defendant's oral statements is the type of constitutional error which may be later raised in a post-conviction hearing, and we thus do not find the matter waived.

In *People v. Melock* (1992), 149 Ill. 2d 423, this court stated:

"It is a fundamental principle of criminal procedure that a confession must be voluntary; otherwise, it is inadmissible. (*Townsend v. Sain* (1963), 372 U.S. 293, 307, 9 L. Ed. 2d 770, 782, 83 S. Ct. 745, 754; *People v. Kincaid* (1981), 87 Ill. 2d 107, 117.) 'The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed.' (*People v. Clark* (1986), 114 Ill. 2d 450, 457; *People v. House* (1990), 141 Ill. 2d 323, 376.) A determination of voluntariness requires consideration of the totality of the circumstances. (*People v. Thomas* (1990), 137 Ill. 2d 500, 516, quoting *People v. Prim* (1972), 53 Ill. 2d 62, 70.) Factors to be considered in making the determination include

the age, education and intelligence of the accused, the duration of the questioning, and whether he received his constitutional rights or was subjected to any physical punishment. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 226, 36 L. Ed. 2d 854, 862, 93 S. Ct. 2041, 2047; *People v. Martin* (1984), 102 Ill. 2d 412, 427.) No single fact is dispositive; the question must be answered on the facts of each case. *Brown v. Illinois* (1975), 422 U.S. 590, 603, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261; *People v. Hattery* (1989), 183 Ill. App. 3d 785, 821." *Melock*, 149 Ill. 2d at 447-48.

The established standard of review of a trial court's finding on a question of the voluntariness of a confession is whether the finding is contrary to the manifest weight of the evidence. (*Melock*, 149 Ill. 2d at 448; *People v. Kincaid* (1981), 87 Ill. 2d 107, 120.) Defendant argues that this standard of review is too stringent and that this court should review the voluntariness of a statement *de novo*, citing *Miller v. Fenton* (1985), 474 U.S. 104, 88 L. Ed. 2d 405, 106 S. Ct. 445 (during *habeas corpus* proceedings, Federal courts required to provide *de novo* review of State court decisions on voluntariness of statements), and *United States v. Harrison* (9th Cir. 1994), 34 F.3d 886, 890 (*de novo* review of Federal district court decision on voluntariness during direct appeal of Federal conviction). Although this court has never departed from the "manifestly erroneous" standard in reviewing the denial of a defendant's motion to suppress based upon the voluntariness of a confession (see *Melock*, 149 Ill. 2d at 448-49), this is because, in a vast majority of cases, the voluntariness determination involves resolving conflicts in the facts and questions as to the credibility of witnesses which is best done by the trial court. (See *People v. Higgins* (1972), 50 Ill. 2d 221, 225.) However, here, the record contains both a videotape and a transcript of the interrogation, so that neither the facts nor the credibility of witnesses is in issue. Thus, the voluntariness of defendant's statements is a

question of law which this court may consider *de novo.*
*People v. Foskey* (1990), 136 Ill. 2d 66, 76; see also *People
v. James* (1994), 163 Ill. 2d 302, 310; *People v. Turnage*
(1994), 162 Ill. 2d 299, 305.

Accordingly, we have examined the particular cir-
cumstances surrounding defendant's interrogation, as
well as his relevant personal characteristics, and
conclude that the investigators' remarks challenged by
defendant did not induce him to make involuntary oral
statements. Defendant maintains that a number of false
and misleading promises were made by his interroga-
tors indicating they could help defendant if he confessed.
Defendant cites the following comments by an investiga-
tor as constituting such an impermissible promise:

> "And I'll tell you what. If we go up there and Tonya's
> telling something different, you're going to end up in front
> of a judge *** with us saying that you were *** uncoopera-
> tive and you lied from the beginning. And I don't think
> you want that.
>
> I really don't think you want that. I mean people make
> mistakes all the time, but you have to have some remorse
> and say that there was a mistake and be honest and tell
> what's going on. And if you don't, a judge is going to see
> you just as a hard case."

Defendant argues that these comments falsely implied
the interrogators could prevent the judge from discover-
ing defendant had lied and that they would help him by
favorably influencing the judge. However, we agree with
the State that these comments do not remotely support
defendant's inferences. Instead, they convey only that
defendant should tell the truth, and that the judge .
would look unfavorably on him if he did not.

Defendant next complains about the following
remarks made by Detective Hamilton:

> "[W]e are going to find out what happened here. Either
> you or Tonya hurt this child. There's just no doubt.
> There's none whatsoever.
>
> There's no way—there's enough doctors up at the

University of Iowa Hospital that are going to say that this is a child that's been hit. And every one of them are going to go to court.

And you can sit there and say no and just increase the time that you're going to have to answer to the consequences. Just that simple. You're not doing yourself any favor. You're really not. You're making it worse.

Now if you want I'll take a clean piece of paper, you can start over and tell me whatever happened."

Defendant contends that the comments in the penultimate quoted paragraph falsely implied the police would help him at sentencing if he confessed. We cannot agree with this interpretation of the detective's remarks, which we believe simply meant that the evidence of the victim's injuries was contrary to the story defendant had told, and that he should tell the truth.

Defendant next claims the remark, "We are not here to throw your ass in jail. We're here to do our job," was untrue and implied the police would help defendant escape incarceration. Again, defendant has read an unsupported inference into the comment, which accurately stated that the interrogators' purpose was not to put him in jail, but to do their job of investigating the offense by questioning him. Defendant maintains that the investigators also told him that lying to them would be worse than confessing, implying that they could help or harm him at sentencing based upon his decisions during interrogation:

"Now I want to take notes because what I want to do is I want to get it in writing, okay? I want to reduce what we talked about into a statement form. Okay?

* * *

As I said before, what you're going to say is going to incriminate you. But don't hurt yourself to the point of being untruthful. That's going to hurt you — that will hurt you worse."

We agree with the State that these remarks properly

urged defendant to tell the truth, while warning him that what he said might incriminate him.

Finally, defendant complains of the following remarks, made by Detective Hamilton after defendant completed his oral statements, but before giving his written statement:

"[W]hen you give a written statement then you're just corroborating or backing up *** what you've already said.

You're not afraid to tell the truth. And it always, as we tell everyone, that your cooperating is looked upon favorably by the State's Attorney, okay? We're the middlemen between the State's Attorney, okay? We tell him because most of the time the State's Attorney never talks to people, okay?

\* \* \*

We're the ones that talk to people and we're the ones that gives [sic] him the input as far as how far or where do we think that they're telling the truth, okay?"

Defendant contends that these remarks were also a promise that the police would help defendant in exchange for a confession. These comments, however, were not a promise of help, but accurately stated that the investigators worked closely with the State's Attorney, who would look favorably on his cooperation.

Defendant cites several appellate court cases in support of his claim that the misleading promises made to him rendered his statements involuntary. (See *People v. Shaw* (1989), 180 Ill. App. 3d 1091 (confession suppressed where defendant was told he could probably get psychiatric help through the court at sentencing if he talked); *People v. Rhoads* (1979), 73 Ill. App. 3d 288 (confession suppressed where police told defendant they thought he was sick and that they would get him help if he talked); *People v. Peck* (1974), 18 Ill. App. 3d 112 (confession suppressed where State failed to deny defendant was told he could go home if he gave a statement).) However, as we have already determined, unlike the remarks in

*Shaw, Rhoads* and *Peck,* none of the remarks here were promises of help in exchange for a statement. Nor were they untruthful or deceptive.

Additionally, the totality of the circumstances shows that defendant's statements were noncustodial and voluntarily made. At the time of his interrogation, defendant was 25 years old and had agreed to accompany investigators to the police station. Defendant was told that he was not under arrest and the doors to the interview room were open. Defendant, who was of normal intelligence and had a tenth grade education, was questioned for approximately two hours. He was provided a soft drink and was allowed to smoke. Although he was tired, there was no indication that he was under the influence of alcohol or drugs, and his speech and appearance were normal. Defendant himself testified that he was tired because he was under emotional strain. Further, defendant was twice advised of and waived his *Miranda* rights, once before any questioning took place, and again after he made his oral statements and the investigators asked him to reduce them to writing. Defendant was familiar with the criminal justice system from prior prosecutions, and the questioning ceased when he said he wanted to stop. Defendant was not arrested or handcuffed until after he made his statements. Thus, the totality of the circumstances establishes that defendant's will was in no way overborne by the investigators' comments, which reflect no more than rigorous and accusatorial questioning.

Nor was defendant's fifth amendment right to counsel violated by the continuation of questioning after his ambiguous remark, "Should I see a lawyer?" Defendant argues that when a suspect makes an ambiguous request for counsel, further questioning must be limited to clarifying that request, citing *Towne v. Dugger* (11th Cir. 1990), 899 F.2d 1104, 1107-08. However,

the Supreme Court in *Davis v. United States* (1994), 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350, recently declined to adopt a rule requiring officers to ask clarifying questions when a suspect makes an ambiguous or equivocal statement regarding counsel. In *Davis*, the Court found that petitioner's remark to the investigating agents, "Maybe I should talk to a lawyer," was not a request for counsel and that the authorities therefore were not required to stop questioning petitioner. *Davis*, 512 U.S. at 462, 129 L. Ed. 2d at 373, 114 S. Ct. at 2357.

In the instant case, after defendant's oral statement was concluded, the investigators told him that they considered him to be under arrest. The following exchange then occurred:

"MR. HAMILTON: Do you have any problem with putting this down on paper what we talked about?

THE WITNESS: I don't know. Should I see a lawyer?

MR. HAMILTON: That's up to you. I've already read you your rights. You've already admitted it with three witnesses, okay, 'cause I told you before when you put it in writing or admit that you're, number one, you know if you're truthful we can corroborate things. You're only helping yourself. But you're also incriminating yourself.

\* \* \*

So whether or not you need an attorney you have to tell me, all right?

THE WITNESS: Uh huh.

MR. HAMILTON: But that's up to you. If you want to give me a statement fine, I'll be happy to take it. If you don't then I won't. No problem. I'm not going to get pissed at you. No big deal. That's something you have to sort out for yourself, okay? I'm here to do my job. And I have to honestly tell you that I believe it's in your best interest, okay?"

Defendant argues that Detective Hamilton did not limit himself to clarifying defendant's ambiguous request, and we agree. Although Hamilton did tell defendant that the decision was his to make, and that if

he did not want to give a statement it would be "No problem," overall, his comments urged defendant to give a written statement. We also agree with the Supreme Court that under these circumstances, it is "good police practice" for the interviewing officers to clarify whether or not a suspect actually wants an attorney. (*Davis*, 512 U.S. at 462, 129 L. Ed. 2d at 373, 114 S. Ct. at 2356.) Here, a straightforward clarifying question would have eliminated the need for our examination of this issue on appeal. However, under *Davis*, we cannot say that the police conduct herein violated defendant's fifth amendment rights, where, absent an unambiguous or unequivocal request for counsel, they had no obligation to stop questioning defendant. *Davis*, 512 U.S. at 462, 129 L. Ed. 2d at 373, 114 S. Ct. at 2356.

Defendant also contends that he was denied his right to a fair trial where the State introduced evidence of prior injuries to the victim without establishing that defendant had inflicted those injuries. Defendant objects to certain testimony given by Drs. Nagendra, Vermeer and Burke, Linda Johnson and Fern Harper. The State argues that defendant has waived objection to all but Dr. Nagendra's testimony. However, we believe the record shows that defendant has sufficiently preserved this issue not only as to the testimony of Dr. Nagendra, but also as to Kappelman and Dr. Vermeer. Defendant has waived his contentions of error as to the testimony of Linda Johnson, Fern Harper and Dr. Burke, where he failed to make contemporaneous objections at trial or to raise the issue as to these witnesses in his post-trial motion. This court has previously held that questions concerning the propriety of other-crimes evidence which are not raised at trial or preserved in a post-trial motion need not be considered on review unless admission of the evidence constituted plain error. (*People v. Todd* (1992), 154 Ill. 2d 57, 70; *People v. Enoch* (1988), 122 Ill.

2d 176, 198.) Justice does not require the application of the plain error doctrine in cases where evidence of the defendant's guilt is overwhelming (*Todd*, 154 Ill. 2d at 70), and such is the case here, where voluminous expert testimony established that defendant intentionally inflicted the victim's fatal brain injuries by a combination of impact and shaking.

Generally, evidence of prior acts and offenses may not be introduced to show propensity to commit crime. (*People v. Lucas* (1989), 132 Ill. 2d 399, 429; *People v. Bartall* (1983), 98 Ill. 2d 294, 309-10.) Evidence of other crimes is admissible if it tends to prove *modus operandi*, design, motive or knowledge. (*Lucas*, 132 Ill. 2d at 429; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) However, before such evidence is admitted, the State must first show that a crime took place and that the defendant committed it or participated in its commission. (*People v. Thingvold* (1991), 145 Ill. 2d 441, 455; *Wernowsky v. Economy Fire & Casualty Co.* (1985), 106 Ill. 2d 49, 55.) Proof that the defendant committed or participated in the crime need not be beyond a reasonable doubt, but must be more than a mere suspicion. (*Thingvold*, 145 Ill. 2d at 456.) Additionally, where evidence of the defendant's involvement in another offense is offered to prove the absence of an innocent frame of mind or the presence of criminal intent, mere general areas of similarity between the two offenses will suffice. (*People v. Illgen* (1991), 145 Ill. 2d 353, 373; *McKibbins*, 96 Ill. 2d at 185-86.) The trial court's ruling as to the admissibility of such evidence will not be reversed absent a clear showing of abuse of discretion. *Thingvold*, 145 Ill. 2d at 452-53.

In the instant case, defendant's involvement in the victim's death was established by his own testimony. However, defendant claimed that he did not have the intent to kill or cause great bodily harm to the victim.

Evidence that defendant was involved in prior incidents in which the victim suffered similar injuries was therefore admissible to show the presence of intent or knowledge and the absence of accident. (See *Lucas*, 132 Ill. 2d at 429.) Defendant admits that the injuries suffered by the victim in the June 22 bathtub incident, the subject of the complained-of testimony, were "remotely" similar to the fatal injuries. In fact, the experts agreed that the fatal head injuries, the broken collar bone and the injury to the mesentery resulted from blunt, violent force, as did the old injuries to the victim's cerebellum and adrenal gland which occurred around June 22. The bruises and internal injuries suffered by the victim in both June and July were consistent with battered child syndrome. Thus, the evidence established that the complained-of prior offense was sufficiently similar to the fatal acts to be admissible at trial.

However, defendant argues that the cause of the victim's June 22 injuries was a febrile seizure and not abuse. We believe the evidence establishes more than a "mere suspicion" that the June 22 incident was one of prior abuse committed by defendant. Kappelman, Linda Johnson and defendant himself each testified that defendant was alone with the victim during the June 22 bathtub incident. Although Kappelman testified that because of the victim's unusual behavior and high temperature she believed he was having a seizure, no evidence confirming a seizure was ever presented. Indeed, Dr. Nagendra testified that the victim's temperature was only 100 degrees when taken at the hospital that evening, and that he was suspicious because "Jerry was fine after supposedly having a 105 fever and usually when you have that kind of fever you don't get better the next day and have no fever." Further, the fact that the victim's EEG showed no evidence of abnormal brain wave activity made it even more likely that no seizure

had occurred on June 22. What *is* clear from the evidence is that following the bathtub incident, fresh bruises and abrasions were found around the victim's groin and penis, which both Drs. Nagendra and Vermeer believed were intentionally inflicted.

In *People v. Lucas* (1989), 132 Ill. 2d 399, the defendant similarly claimed that the trial court erred in admitting evidence of other instances in which he had allegedly abused the seven-month-old decedent. One incident of alleged abuse occurred approximately four months before the decedent's death, when he sustained a broken arm while in the defendant's care. While the defendant maintained that the arm was broken when he dropped the decedent, a doctor testified at trial that the break sustained by the child was the same type as the one he suffered on the date of his death. *Lucas*, 132 Ill. 2d at 428.

Here, the record shows that the victim sustained injuries requiring hospital care and resulting in a child abuse investigation while he was in defendant's care on June 22. Although defendant maintains that the victim suffered a seizure, one month later, while again in defendant's care, the victim received fatal injuries which defendant first described to authorities as "a seizure." Additionally, defendant himself testified that he was the victim's primary care-giver during the period in which the prior abuse occurred, and that Tonya Nelson never harmed the victim. While defendant was out of town, the victim recovered from those injuries and was fine until defendant returned to stay with Tonya and the victim on July 27 through 29 and inflicted his fatal injuries. Given this evidence, we believe the State sufficiently established that a prior offense occurred on June 22 and that defendant committed it. We agree with the State that the evidence of prior abuse was relevant to prove intent precisely because it diminished the pos-

sibility that defendant did not knowingly inflict the acts which caused the victim's death. (See *Illgen,* 145 Ill. 2d at 366.) There was therefore no abuse of discretion in admitting the testimony of Kappelman and Drs. Nagendra and Vermeer.

We further conclude that introduction of testimony regarding the June 22 incident was cumulative of other testimony by Drs. Hart, Frasier and McDonald which described the victim's prior injuries, stated that they were consistent with injuries which occurred around June 22, and that the victim was subjected to ongoing abuse. Where defendant did not object to this testimony, or request that a limiting instruction be given, he is in a poor position to claim that prejudice resulted. See *People v. Lucas* (1992), 151 Ill. 2d 461, 487.

We next address defendant's contention that the State failed to prove him guilty of murder because it failed to prove beyond a reasonable doubt that he knew that shaking a child would cause death or great bodily harm or would create a strong probability of death or great bodily harm. Defendant argues that the evidence showed he acted recklessly, and asks that his conviction be reduced to one for involuntary manslaughter. However, it is not the function of the reviewing court to retry a defendant when considering a challenge to the sufficiency of the evidence of his guilt. (*People v. Tye* (1990), 141 Ill. 2d 1, 13; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) Rather, determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. (*Tye,* 141 Ill. 2d at 13, quoting *People v. Jimerson* (1989), 127 Ill. 2d 12, 43.) In considering a defendant's challenge to the sufficiency of the evidence, the relevant question is whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt. (*Tye*, 141 Ill. 2d at 14; *Collins*, 106 Ill. 2d at 261.) In the instant case, we conclude that the evidence was sufficient to sustain defendant's conviction for murder.

As previously noted, defendant was charged under the knowing and felony murder sections of the murder statute. Accordingly, defendant could be found guilty of murder if the evidence established that he knew that his acts would cause, or would create a strong probability of, death or great bodily harm, or if he was attempting or committing a forcible felony (aggravated battery of a child) from which death resulted. (See Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a)(2), (a)(3).) Defendant contends that the State presented no such evidence and that he consistently denied intending to kill the victim. However, here, the requisite mental state may be inferred from defendant's conduct and the circumstances surrounding his commission of the crime. See *Tye*, 141 Ill. 2d at 15; *People v. Terrell* (1989), 132 Ill. 2d 178, 204.

In *People v. Bartall* (1983), 98 Ill. 2d 294, 307, this court explained that, "[t]o prove the crime of murder, it is not necessary to show that the defendant has a specific intent to kill or do great bodily harm or that he knows with certainty that his acts will achieve those results." Rather, the necessary mental state may be inferred from evidence that the defendant committed a voluntary and willful act which has the natural tendency to cause death or great bodily harm. (*Tye*, 141 Ill. 2d at 15; *Terrell*, 132 Ill. 2d at 204.) "Disparity in size and strength between the defendant and the victim and the nature and extent of the victim's injuries are relevant circumstances in ascertaining whether the defendant possessed the necessary mental state." *Tye*, 141 Ill. 2d at 15-16; see also *People v. Ward* (1984), 101 Ill. 2d 443, 451-52.

In *Tye*, as in the present case, the defendant was an adult male, and the victim was a three-year-old child. The defendant in *Tye* beat the child for about an hour, using first a belt and then an extension cord. This court held that considering the disparity in size between the defendant and the victim, the brutality and duration of the beating, and the severity of the victim's injuries, the trial judge could infer that the defendant acted with the necessary mental state in bringing about the child's death. (*Tye*, 141 Ill. 2d at 16.) Similarly, in *Ward*, this court upheld the murder conviction of an adult male defendant who beat a four-year-old child to death with his fists and a mop handle. The court held that the defendant was not entitled to an involuntary manslaughter instruction where the evidence showed that the defendant was not simply acting recklessly. *Ward*, 101 Ill. 2d at 451-53.

Here, as in *Tye* and *Ward*, the disparity in size, the nature of the victim's injuries and the deliberate force needed to cause them negate any suggestion that defendant's acts were only reckless. At the time of the offense, defendant was approximately six feet tall and weighed 164 pounds, about five times more than the 3 foot, 4 inch, 35-pound victim. The evidence established that the injuries inflicted on July 29 resulted from repeated violent blunt trauma caused by impact and severe and repetitive shaking, and not from the events defendant described. According to the expert testimony presented by the State, defendant used force equivalent to an automobile accident or a 20-foot fall onto concrete to break the victim's collarbone and to cause the massive brain hemorrhaging, swelling and migration which resulted in his death.

Defendant relies on *People v. Holmes* (1993), 246 Ill. App. 3d 179, where the appellate court reduced the defendant's conviction from first degree murder to in-

voluntary manslaughter because the evidence showed that the defendant was unaware that shaking a child could be fatal, and where the child's death was a result of a one-time shaking. Here, however, the evidence showed that defendant did not merely shake the victim once, but instead struck him with or against an object with blunt, violent force, and repeatedly and violently shook him so that his head whiplashed back and forth. The experts unanimously testified that the victim's broken collarbone, extensive eye and brain hemorrhaging, adrenal gland and bowel mesentery hemorrhaging and multiple bruises were intentionally inflicted and could not have been caused accidentally or by the incidents which defendant claims occurred. Therefore, given the disparity in size between defendant and the victim, the extent of the victim's injuries and the force needed to cause them, it is an absurdity for defendant to argue that he did not know his actions would create a strong probability of death or great bodily harm to the three-year-old child. (See *Terrell*, 132 Ill. 2d at 205.) The evidence clearly supported a conviction for murder under either section 9—1(a)(2) or section 9—1(a)(3) of the Criminal Code.

Defendant also argues he was denied his right to a fair trial where the State elicited testimony from Dr. Frasier that the victim's injuries were not accidental, but were intentional and the result of "on-going" child abuse. Defendant contends that the ultimate issue at trial was whether he acted recklessly and that the jury was competent to decide the mental state that prompted the infliction of the injuries without expert testimony. (See *Harvey v. Norfolk & Western Ry. Co.* (1979), 73 Ill. App. 3d 74, 83 (if the jury is competent to determine the facts in issue, then the expert opinion is of no special assistance to the jury and should not be admitted).) Defendant relies on *People v. Perry* (1986), 147 Ill. App. 3d

272, where the appellate court held that the improper admission of a pathologist's expert opinion that an infant's suffocation death was not accidental was reversible error because the testimony involved the central issue of the case which the jury was competent to determine.

We need not consider this alleged error because it was waived by defendant's failure to raise the issue at trial and to preserve it in a post-trial motion. (*Enoch*, 122 Ill. 2d at 198.) Waiver aside, the issue is meritless. This court has stated that, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion. (*People v. Enis* (1990), 139 Ill. 2d 264, 288; *People v. Jordan* (1984), 103 Ill. 2d 192, 208.) In this case, we conclude that the lay jury needed the expert testimony of Dr. Frasier to determine whether, based on their severity, the victim's injuries were caused intentionally or accidentally.

Defendant's reliance on *Perry* is misplaced. In *Perry*, the appellate court properly held that the expert testimony was inadmissible for two reasons. First, the jury was competent to determine whether the defendant could have accidentally rolled over onto her infant in her sleep and remained there for the five minutes needed to suffocate him. Second, the record did not show that the witness' expertise extended to determining the ability of the mother to feel her infant beneath her during sleep. (See *Perry*, 147 Ill. App. 3d at 275.) Here, the jury had to determine defendant's mental state, not from his commission of a known, specific act, as in *Perry*, but from the nature and extent of the victim's injuries. Additionally, unlike the witness in *Perry*, Dr. Frasier's testimony was particularly within her expertise as a physician and child abuse expert and outside the jury's.

Therefore, we decline to find error in the trial court's admission of Dr. Frasier's testimony.

We next address defendant's contention that involuntary manslaughter instructions were improperly given because the State, seeking a murder conviction, argued that defendant was not guilty of involuntary manslaughter. Defendant acknowledges that this issue is defaulted where he himself submitted the instructions to which he now objects and failed to raise the issue in his post-trial motion. (*People v. Shields* (1991), 143 Ill. 2d 435, 446.) Defendant urges that the waiver rule not be applied here because substantial defects in jury instructions rising to the level of plain error may be noticed although they were not brought to the attention of the trial court. (See *Shields*, 143 Ill. 2d at 446; *People v. Jenkins* (1977), 69 Ill. 2d 61, 65-66.) However, we agree with the State that there was no error in giving the involuntary manslaughter instructions, let alone plain error which would allow review despite defendant's waiver.

Defendant claims the involuntary manslaughter instructions given at his trial caused confusion similar to that found in *People v. Reddick* (1988), 123 Ill. 2d 184, because they placed the burden of proving recklessness on the State, whose interest was in proving a more culpable mental state. Defendant maintains that "[o]nce the state argued that there was no proof of recklessness, the jury would not consider recklessness." We believe that *People v. Lucas* (1989), 132 Ill. 2d 399, is dispositive of this issue. In *Lucas*, the defendant contended, as here, that because the involuntary manslaughter instructions require that the State prove recklessness, any evidence presented by the defendant could have been disregarded by the jury, citing *Reddick*. (*Lucas*, 132 Ill. 2d at 441-42.) The *Lucas* court found *Reddick* distinguishable, because in *Reddick* this court treated unreasonable belief and

heat of passion as affirmative defenses to murder which had to be disproved by the State. (*Lucas*, 132 Ill. 2d at 442.) In *Lucas*, as here, the State "d[id] not have to disprove recklessness in order to establish the intent or knowledge necessary for a murder conviction because recklessness is not an affirmative defense to murder but, rather, a separate and distinct mental state." (*Lucas*, 132 Ill. 2d at 441.) Thus, as in *Lucas*, we find no error here where the instructions given properly stated the burden of proof and did not prevent the jury from considering evidence which would allow conviction for involuntary manslaughter. See *Lucas*, 132 Ill. 2d at 442-43.

With regard to sentencing matters, defendant contends that his waiver of a jury for his capital sentencing hearing was not knowing and intelligent because the trial court did not tell him that any one juror could preclude imposition of the death penalty. Defendant admits that this issue was waived by his failure to raise it in his post-trial motion, and requests that we review it under the plain error doctrine. We find that no error occurred. This court has repeatedly held that in order for a jury waiver at a capital sentencing hearing to be knowing, intelligent and voluntary, a defendant need not be expressly advised that the vote of a single juror will preclude imposition of the death penalty or that the decision of the jury to impose the death penalty must be unanimous. (*People v. Ramey* (1992), 152 Ill. 2d 41, 59; *People v. Ruiz* (1989), 132 Ill. 2d 1, 20-21.) Thus, in the present case, a valid jury waiver occurred where the trial court explained to defendant that he was waiving the right to have the jury consider the capital sentencing issues and that the sentencing decision would, therefore, be made by the court alone. See *Ramey*, 152 Ill. 2d at 59.

We next address defendant's contention that his

death sentence should be vacated because the sole eligibility factor was not established where the victim's murder was not exceptionally brutal or heinous and indicative of wanton cruelty. Section 9—1(b)(7) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(7)) provides that a person convicted of murder may be eligible for the death penalty if "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." Defendant submits that the medical testimony established that the three-year-old victim's fatal brain injury caused a loss of consciousness within, at most, several minutes after its infliction. Defendant contends that because the victim quickly lost consciousness he was incapable of feeling pain and therefore, in light of *People v. Lucas* (1989), 132 Ill. 2d 399, a finding of brutal or heinous behavior was precluded.

In *Lucas*, the defendant was convicted of murder after he, in a drunken stupor, shook his seven-month-old son, banged him against his crib, and suffocated him. The child died of suffocation almost immediately after the injuries were inflicted, and the injuries themselves could have resulted from a single blow. Because there was insufficient evidence to indicate that the death was either premeditated, prolonged or torturous, this court found that all of the qualifying requirements of section 9—1(b)(7) were not met and, consequently, the defendant was not eligible for the death penalty under that section. *Lucas*, 132 Ill. 2d at 446.

We find *Lucas* to be distinguishable from the instant case. *Lucas* does not stand for the proposition that any wound quickly inflicted is not brutal or heinous; rather, the court ruled that the particular facts of that case required such a finding. (See *People v. Johnson* (1993), 154 Ill. 2d 356, 368 (trial court's finding that murder

was exceptionally brutal or heinous and indicative of wanton cruelty not inconsistent with *Lucas* where, although victim was unconscious 5 to 10 seconds after being stabbed and died within half a minute, defendant acted with premeditation and in cold blood).) Here, as in *Johnson* and unlike *Lucas*, the record indicates the presence of one of the three elements generally required for a finding of eligibility under section 9—1(b)(7): prolonged pain, torture or premeditation. (See *Johnson*, 154 Ill. 2d at 368; *Lucas*, 132 Ill. 2d at 445-46.) Defendant acknowledges that the medical testimony established that the victim's fatal brain injury was the result of severe shaking, his fractured clavicle indicated a violent impact, his mesentery or bowel injuries were caused by blows to the stomach and his external bruises were consistent with either grasp marks from the shaking or multiple impacts. This testimony belies defendant's contention that the victim did not suffer for a significant time before lapsing into unconsciousness.

Further, the trial court specifically found that the murder involved prolonged pain to the victim, stating:

> "I think that beyond a reasonable doubt the conduct is exceptionally brutal as defined, exceptionally brutal or grossly ruthless, devoid of mercy or compassion, cruel and coldblooded, and I think that the evidence was beyond a reasonable doubt that there was no instantaneous death.
>
> That as a result of the numerous means of inflicting these injuries, Jerry Nelson experienced pain which was beyond his understanding as a three to four-year-old.
>
> * * *
>
> I think the evidence shows beyond a reasonable doubt that there is a, not a period of seconds, but a more substantial period of time within which Jerry Nelson in his pain was losing consciousness, his brain was herniating."

We agree that the evidence of record establishes that the victim's injuries were severe, that defendant inflicted them with extreme and violent force, that he

did so in separate acts, and that the victim suffered prolonged pain. Thus, the trial court did not err in concluding that defendant was eligible for death under section 9—1(b)(7) where the murder was exceptionally brutal or heinous and indicative of wanton cruelty.

Defendant also challenges the facial validity of section 9—1(b)(7). Defendant contends that the terms used in the statute to define the conduct that will sustain a finding of eligibility, "exceptionally brutal or heinous behavior indicative of wanton cruelty" (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(7)), are unconstitutionally vague and that this court has failed to craft a narrowing construction sufficient to comply with the eighth and fourteenth amendments. Defendant has waived this issue because the allegations in his post-trial motion, that the trial court erred in finding him eligible for the death penalty and in sentencing him to death, are too general to preserve his present contention. *Henderson*, 142 Ill. 2d at 322.

Moreover, this court has repeatedly rejected defendant's argument, holding that the statutory language of section 9—1(b)(7), as interpreted, sufficiently channels the discretion of the sentencer. (*Tye*, 141 Ill. 2d at 31-32; *Lucas*, 132 Ill. 2d at 443-46; *People v. Odle* (1988), 128 Ill. 2d 111, 138-41.)

> "As this court determined in *Lucas*, the terms used in section 9—1(b)(7) have been construed in other contexts as involving the infliction of prolonged pain or torture, or premeditated behavior on the part of the defendant, and it is on those bases that the aggravating circumstances should be applied. (*Lucas*, 132 Ill. 2d at 445-46.) With that construction, adequate guidance is given to the sentencer." *Tye*, 141 Ill. 2d at 32.

Defendant also asserts that the trial court was not entitled to the presumption that it applied this court's limiting construction because the trial court stated that it was applying the "natural meaning" of the terms

when it found defendant eligible for death. (See *Walton v. Arizona* (1990), 497 U.S. 639, 654, 111 L. Ed. 2d 511, 529, 110 S. Ct. 3047, 3057.) However, the trial court's comments, considered in their totality, reflect an awareness of this court's decisions in both *Odle* and *Lucas*. In particular, we note the trial court's belief in the need for an "articulated reasoned analysis for discerning between the so-called ordinary murder and that murder situation which, in fact, falls within the statutory language of exceptionally brutal or heinous behavior indicative of wanton cruelty." We therefore reject defendant's contention that the aggravating factor found in section 9—1(b)(7) is unconstitutional.

Defendant also argues that the trial court erred in rejecting psychiatrist Dr. Robert Chapman's testimony that the murder was committed while defendant was "under the influence of extreme mental or emotional disturbance." (See Ill. Rev. Stat. 1991, ch. 38, par. 9—1(c)(2).) Despite the State's claim of waiver, we believe that this issue was sufficiently preserved for our review by its inclusion in defendant's post-trial motion, coupled with defense counsel's argument at the hearing on that motion. However, we find that the trial court did not err in rejecting the expert testimony regarding the presence of this statutory mitigating factor. Although the mitigation testimony of Dr. Chapman was unrebutted, the credibility and weight to be given to this testimony were for the trial court as trier of fact. (*People v. Boclair* (1989), 129 Ill. 2d 458, 493.) The ultimate question of whether or not the death penalty is the appropriate sentence is an issue for the trial court, not the expert. *Boclair*, 129 Ill. 2d at 493.

Dr. Chapman testified that defendant had an extreme emotional disturbance which was not the result of an ongoing disorder, but was temporary and triggered by the victim's wetting his pants and contributed to by

defendant's unemployment. It was Dr. Chapman's opinion that defendant had been abused as a child when he failed to meet the needs and demands of adults, and that consequently defendant looked to the victim to serve his needs by giving him the feeling he was in control as a caretaker. When the victim did not meet those needs, defendant reacted with great emotion and without thought.

Dr. Chapman reached his conclusions after reviewing various reports and examining defendant for 3 1/2 hours. However, the psychiatrist performed no tests and did not corroborate with family members defendant's claim that he had been abused as a child. Additionally, Dr. Chapman did not discuss with defendant his actions in committing the offense, but relied on the videotape and transcript of defendant's statement. Although Dr. Chapman believed defendant had abused the victim, he felt the act which caused the victim's death occurred when defendant threw him toward a mattress and he missed and hit a concrete floor, and that the medical testimony was consistent with this finding.

We believe the trial court's finding as to Dr. Chapman's testimony was a proper exercise of its discretion. (See *People v. Christiansen* (1987), 116 Ill. 2d 96, 122 (supreme court will not lightly overturn trial court's finding during aggravation and mitigation phase of death penalty hearing).) The weight and credibility of Dr. Chapman's testimony were seriously diminished by several factors, most notably his belief that the victim's injuries were caused as defendant described in his statement. This fact was overwhelmingly refuted by the evidence and rejected by the jury. Contrary to defendant's assertion, this case is unlike *People v. Carlson* (1980), 79 Ill. 2d 564, where this court found the trial court had erred in determining that the defendant was not under extreme mental or emotional disturbances. In *Carlson*,

the trial court discounted the psychiatrist's opinion despite testimony by the defendant's personal physician that supported the psychiatrist's finding that the defendant was extremely distraught when he killed the victim. Here, however, not only were the other medical opinions at odds with Dr. Chapman's belief as to the cause of the victim's injuries, but Dr. Chapman admitted that his findings would be different if the death was caused "in any other way."

Nor did the trial court reject the extreme emotional disturbance mitigation based on policy or prejudice, as in *People v. Boclair* (1989), 129 Ill. 2d 458. Here, the court stated that it had difficulty concluding, without more substantive psychiatric diagnoses, that in the language of the statute a person could be under the influence of an extreme mental or emotional disturbance when the facts indicated no recent stress, but rather the victim's conduct, including wetting his pants, was common and normal for a three-year-old. The trial court then noted: "If the state of psychiatry and the state of the law has come to the point where one can find that one is under the influence of extreme \*\*\* mental or emotional disturbance under these facts, we are indeed in a great deal of trouble." In *Boclair*, the trial court believed the psychiatrist's finding that defendant had a paranoid personality disorder, but failed to consider that testimony based on the court's personal belief that all inmates had paranoid personalities. (*Boclair*, 129 Ill. 2d at 494-95.) Unlike *Boclair*, the trial court in the instant case had already rejected Dr. Chapman's testimony based on credibility when it commented on the danger of finding that common, minor misbehavior could trigger an extreme emotional disturbance. Also unlike *Boclair*, the trial court's concern was an appropriate consideration. *Cf. Carlson*, 79 Ill. 2d at 590 (supreme court, in reversing death penalty, found important that

events which precipitated criminal conduct were unique and tragic and not likely to be repeated in the future).

We next address defendant's contention that the sentencing court violated due process and diminished the reliability of his death penalty hearing by not affording him the right of allocution. However, this court has consistently held that there is no statutory or constitutional right to allocution at a capital sentencing hearing. (*People v. Garcia* (1995), 165 Ill. 2d 409, 437; *People v. Childress* (1994), 158 Ill. 2d 275, 307; *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 280-82.) Insofar as defendant has presented no grounds warranting reconsideration of this holding, his allocution argument is without merit.

Defendant also raises several claims challenging the constitutionality of our death penalty statute. All of these claims have been reviewed and rejected in previous cases. We therefore see no reason to reexamine the following arguments: (1) the death penalty statute places a burden of proof on the defendant which precludes meaningful consideration of mitigation (*People v. Fair* (1994), 159 Ill. 2d 51, 95; *People v. Bean* (1990), 137 Ill. 2d 65, 134; *People v. Whitehead* (1987), 116 Ill. 2d 425, 465); (2) the death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrary or capriciously imposed death sentences (*Fair*, 159 Ill. 2d at 95; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 44); (3) the death penalty statute is unconstitutional because it allows the sentencer to weigh a vague aggravating factor, namely, "[a]ny other reason" (Illinois Pattern Jury Instructions, Criminal, No. 7C.06 (3d ed. 1992)) supported by the evidence why the defendant should be sentenced to death (*People v. Taylor* (1995), 166 Ill. 2d 414, 439; *People v. Rissley* (1995), 165 Ill. 2d 364, 407). We reaffirm this court's holdings in those decisions today.

Finally, we address defendant's argument that his felony murder conviction must be vacated because he could not be convicted of more than one murder where only one person was killed. Defendant was charged and convicted of one count of knowingly causing the death of Jerry Nelson (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(2)) and one count of felony murder based on aggravated battery of a child (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(a)(3)). The trial court imposed the death penalty on both counts of first degree murder. However, a defendant cannot be convicted of more than one murder arising out of the same physical act. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 377.) When multiple murder convictions have been entered for the same act, the less culpable convictions must be vacated. (*Pitsonbarger*, 142 Ill. 2d at 377; see also *People v. Cardona* (1994), 158 Ill. 2d 403, 411.) In the instant case, although there was evidence to support conviction on multiple charges of murder, there was only one person murdered and, therefore, there could be but one conviction for murder. (See *Pitsonbarger*, 142 Ill. 2d at 377-78.) Because the knowing murder involved the more culpable mental state, it is necessary that defendant's conviction for knowing murder be affirmed and that his conviction for felony murder be vacated. See *People v. Bone* (1982), 103 Ill. App. 3d 1066, 1068.

For the reasons herein stated, defendant's conviction and sentence for knowingly killing Jerry Nelson is affirmed; the felony murder conviction is vacated. The clerk of this court is directed to enter an order setting Wednesday, May 15, 1996, as the date on which the death sentence, entered in the circuit court of Henry County, is to be carried out. Defendant shall be executed in the manner provided by law. (725 ILCS 5/119—5 (West 1992).) The clerk of this court shall send a certified copy of the mandate in this case to the Direc-

472

tor of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution in which defendant is now confined.

*Judgment affirmed in part and vacated in part.*