675 N.E.2d 156 (1996)
285 Ill. App.3d 965
221 Ill.Dec. 249
In re J.E. and V.B., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
J.E. and V.B., Respondents-Appellants).
Nos. 94-0640, 94-0686.
Appellate Court of Illinois, First District, Third Division.
December 23, 1996.
*159 Michael J. Pelletier, Deputy Defender, Chicago (Lori L. Mosby and Anna Ahronheim Assistant Appellate Defenders, of counsel), for Respondents-Appellants.
Richard Devine, State's Attorney, Cook County, Chicago (Renee Goldfarb, Linda Woloshin, Nancy Faulls, Assistant State's Attorneys, of counsel), for Petitioner-Appellee.
Presiding Justice COUSINS delivered the opinion of the court:
Minor respondent J.E. was found to be a delinquent juvenile in that he committed the offenses of attempted murder, two counts of aggravated battery, two counts of aggravated discharge of a firearm, armed violence and aggravated assault. Minor respondent V.B. was also found to be a delinquent juvenile in that he committed armed violence and two counts of aggravated battery. Both respondents were committed to the Department of Corrections. On appeal, the respondents contend that the trial court: (1) erred in denying their motions to suppress statements they made to police officers; (2) lacked jurisdiction to enter a delinquency finding and a dispositional order committing V.B. to the Department of Corrections; and (3) abused its discretion in excluding J.E.'s parents from the adjudicatory hearing.

BACKGROUND
Prior to trial, motions to suppress statements were filed alleging, inter alia, that the statements J.E. and V.B. made to investigating officers on the night of the offense should be suppressed because the statements were coerced. At the hearing on the motion to suppress, Officer Kwasinski testified that, on August 9, 1993, at approximately 9 p.m., he and Officers Mok and Rice responded to a shooting at 3601 W. Foster and were conducting a search for the offenders. Approximately 20 minutes after the shooting, the officers saw J.E. and V.B., who fit the description of the wanted offenders. The officers asked J.E. and V.B. to take a ride in the police car to participate in a showup approximately one block away. J.E. and V.B. were arrested after being identified in the showup. On the way to the police station, Officer Kwasinski advised J.E. and V.B. of their rights. J.E. and V.B. stated that they understood their rights and that they did not know anything about the shooting. Officer Kwasinski testified that, when they arrived at the police station at 9:15 p.m., the juveniles were separated so that they could not confer with one another. J.E. was placed in the "tact" office, a 10-foot by 13-foot room with desks and a table. Officer Rice was with him. V.B. was placed in an interview room with a pop machine, a long bench and two tables. Officer Mok was with him. Officer Kwasinski testified that he re-advised J.E. of his rights, stopping to ask him if he understood each individual right as it was given. After stating that he understood each right, J.E. said he did not have anything to do with the shooting. Officer Kwasinski also re-advised V.B. of his rights, stopping to ask him if he understood each individual right as it was given. After stating that he understood each right, V.B. said he did not have anything to do with the shooting. Officer Kwasinski then left the station to notify the respondents' parents. When Officer Kwasinski arrived at J.E.'s house, he informed J.E.'s mother that J.E. had been arrested, that he was located at the 17th district police station and that she should go to the station. Also, after receiving the mother's permission, Officer Kwasinski *160 searched J.E.'s room. He then went to V.B.'s residence, but he was unable to make contact with anyone who knew V.B. Officer Kwasinski stated that he returned to the police station between 10 p.m. and 11 p.m. Upon arriving at the station, Officer Kwasinski saw J.E.'s mother and he had a brief conversation with her. He denied preventing J.E.'s mother from seeing her son, and he also denied hitting or threatening J.E.
Officer Mok testified that he arrested respondents after the shooting incident. The police officers transported respondents to the police station, and they arrived at the station at approximately 9:15 p.m. Respondents were separated. J.E. was placed in the tact office and handcuffed to a pole in the room. Officer Mok testified that he never saw anyone threaten or hit J.E. On cross-examination, Officer Mok stated that when J.E.'s mother asked to see her son, Officer Mok responded, "[Y]ou cannot see your son at the moment." Officer Mok further testified that he did not see anyone hit V.B. or hear any screaming or witness any injury to V.B.
Officer Rice testified that the respondents were not questioned regarding the shooting on the way to the police station, but they were given their Miranda rights. He stayed with J.E. in the tact office for over four hours. Officer Rice stated that he first learned that J.E.'s mother was at the police station when the officer on duty at the desk notified him on the intercom system. J.E.'s mother then came into the tact office and spoke with J.E. The mother then returned to the lobby. Officer Rice testified that he did not hit or threaten J.E. or V.B. He also did not witness anyone hit or threaten them.
Detectives Bogucki and Schalk were assigned to the case and arrived at the police station at approximately 10 p.m. The detectives spoke with the arresting officers, interviewed a witness and then left to interview the victim at Children's Memorial Hospital. The detectives testified that they saw J.E. and V.B., but they did not interrogate them prior to going to the hospital. The detectives saw J.E.'s mother at the police station, and they informed her that they were waiting for the youth officer. They did not ask J.E.'s mother if she would like to see her son or if she wanted to be present when her son was questioned.
Youth officer Hedy Woods testified that she was assigned to the case at approximately 12:30 a.m. She arrived at the station at 1 or 1:15 a.m. Officer Woods testified that she spoke with the detectives, reviewed the police reports and spoke with J.E.'s mother. Officer Woods spoke with J.E.'s mother several times throughout the night, giving her updates on what was occurring with J.E. Officer Woods testified that J.E.'s mother did not ask to speak with her son. After Officer Woods spoke with J.E.'s mother, she spoke with J.E. Detectives Bogucki and Schalk were present. J.E. told Officer Woods that he knew his mother was in the police station, but he never asked for his mother to be present. Officer Woods gave J.E. his Miranda rights. J.E. made a statement about the shooting. Officer Woods testified that J.E. never indicated that he had been mistreated by the police. She did not see any marks, bruises or injuries on J.E.
Officer Woods then spoke with V.B. Detectives Bogucki and Schalk were also present. Officer Woods informed V.B. that she was a youth officer, but she did not explain the function of a youth officer. She then learned that officers had gone to V.B.'s residence in an attempt to locate his parents, but no one was home. Officer Woods tried to call V.B.'s home telephone number, but no one answered. She asked V.B. where his mother was, and he responded that she was with a friend, but he did not know the friend's address or telephone number. V.B. stated that his father lived in Florida, but he did not know his telephone number. Officer Woods then read V.B. his Miranda rights, and V.B. made a statement regarding the shooting. Officer Woods testified that V.B. did not tell her that he had been struck or threatened and it did not appear that he had been crying. She also did not see any marks, bruises or injuries on V.B.
At the close of the State's case, the court denied defense counsel's motion for a directed finding.
J.E. testified that he was arrested with V.B. by three uniformed police officers, transported *161 a short distance and told that they had been identified. On the way to the police station, he was asked about the location of the gun. Once at the station, J.E. and V.B were taken to a room together, handcuffed to rings in the wall and questioned about the location of the gun. J.E stated that he did not have a gun. He testified that a tall, white, middle-aged police officer came into the room, threatened him, cursed at him and called him a "pussy." He further testified that this officer said he would like to catch J.E. in a dark alley and do to him what J.E. had done to the boy that got shot. The officers informed J.E. and V.B. that they did not find a gun and then removed V.B. from the room. J.E. stated another group of officers came into the room and called him a liar and told J.E. that he would be hit each time that J.E. said "I don't know." J.E. testified that he was hit with a fist in the chest and in the face. J.E. started to cry. V.B. returned to the room and he was handcuffed to the wall. Two officers then came into the room and stated that the victim had died and that he and J.E. were now going to be charged for murder. J.E. testified that he and V.B. began to cry and the police officers laughed. J.E. then made a statement incriminating himself. He said he made the statement because he was scared and he had been hit. He testified that he had not been read his Miranda rights prior to the statement.
J.E. further testified that after he had been at the police station an hour, he became aware that his mother was there. When he turned to talk to her, the officers pushed him into a room. The officers told him he could not see his mother. After several hours, J.E. was taken to a youth officer. J.E. testified that the youth officer read him his rights for the first time. After he made the statements, the officers read the statement to him and asked if it was correct. J.E. admitted that he did not ask to have his mother present during questioning.
J.E.'s mother testified that she immediately went to the police station when the officers came to her house and informed her that J.E. was being held in connection with a shooting. When she arrived at the station, she asked to see her son and was told that she could not see him until the youth officer arrived. When the youth officer arrived, she told the mother that she would be permitted to see her son after he gave a statement. J.E.'s mother testified that she requested to be with her son during questioning, but the officers refused. When the youth officer arrived, J.E.'s mother saw and spoke to J.E. J.E. told her that a police officer had slapped him and beaten him up. However, she did not see any marks or bruises on him. She also testified that she heard J.E. scream, but she did not complain to anyone about it. She also did not tell anyone about her son's complaint regarding being beaten up. She stated that when she spoke with J.E., he told her that he told the police that he had "done it."
At the conclusion of her testimony, the State requested that J.E.'s mother remain outside the courtroom because she was a potential rebuttal witness. The defense raised no objection to this request, which the court granted.
V.B. testified that he and J.E. were arrested by two officers, taken for a ride, pointed out by someone in a car and questioned about the shooting. V.B. and J.E. were put back in the car and questioned. V.B. stated that he was not read his rights prior to questioning. He and J.E. were taken to the police station and placed in a room together and handcuffed to a wall. The officers asked V.B. where the gun was. One of the officers said he would like to catch V.B. "alone in a dark alley for what he did to that kid." One of the officers said that he was going to go to J.E.'s house and look for the gun. That officer returned 15 to 20 minutes later and said that no gun was recovered. The officers then took V.B. to another room, where he was handcuffed to the wall. One of the officers took the handcuffs off and told V.B. to "get the fuck up." The officer then grabbed him by the neck and threw him to the wall. The officer said, "Tell me where the fucking gun is now, you Spic." The officer said he would stop hitting him if V.B. told him where to locate the gun. V.B. told the officer that he had been at the scene so that the officer would stop hitting him. The officer stopped hitting him and handcuffed him to the wall. After a while, V.B. was *162 taken back to the room with J.E. and handcuffed to the wall. V.B. stated that, at this time, he had not seen a youth officer, nor had he been read his Miranda rights. He then gave a statement and then spoke to the youth officer.
The trial court denied V.B.'s motion to suppress statement, specifically ruling that V.B's testimony was not credible. In denying J.E.'s motion to suppress statement, the court found that J.E.'s testimony also was not credible. Additionally, the court found that J.E.'s mother's testimony was not credible.
Prior to the commencement of testimony for the adjudicatory hearing, the State made a motion to exclude witnesses. The defense joined in this motion. J.E.'s answer included the defense of alibi, listing J.E.'s parents as potential witnesses. Defense counsel stated that he did not plan on calling either of J.E.'s parents to testify. The State motioned to supplement its discovery to add both parents to its list of potential witnesses as rebuttal witnesses. After determining that J.E.'s sister was in court, the court granted the State's request to exclude J.E.'s parents.
Jamie Ruiz (Ruiz) testified that, on the day of the shooting, he was standing on the street corner with his cousin, Oscar Banda (Banda), when a boy on a bike stopped and swore at Banda. Ruiz then heard gunshots and his cousin told him to run. Ruiz felt a bullet enter his buttock and he screamed for help. He was taken to the hospital, where he remained for two days. At the hospital, 12-year-old Ruiz was shown photos of potential offenders, including a photo of J.E. He did not identify J.E. On cross-examination, Ruiz testified that he had a conversation in the waiting room with a woman who identified herself as the mother of J.E. The mother asked whether or not her son had been involved in the shooting, and Ruiz responded that J.E. was not there that day. Banda told Ruiz not to say anymore.
Banda testified that, at 8:30 p.m. on the day of the shooting, he was walking his pit bull terrier with his cousin, Ruiz. About 10 boys on bikes passed them. One of the boys returned and stood on the corner next to Banda. Banda identified that person as J.E. The other boys on bikes returned and V.B. "started trouble" with Banda. Banda responded, "Let's get it on," and the dog growled and barked at the group of boys. V.B. told J.E., "Pop him, pop him." J.E. took out a gun and pointed at Banda. Banda told Ruiz to run. J.E. shot at Banda three times and missed. Banda thought the gun was a toy and started chasing J.E. with the dog. Banda returned to the scene and tried to "sic" the dog on V.B. Banda then heard a woman scream and saw that his cousin had been shot and was lying in the street, bleeding from the abdomen.
Banda talked to the police and, a short time later, identified J.E. and V.B. in a showup. Later, at the police station, Banda noticed that his shirt had two holes in the front that had not been there prior to the shooting. Banda also made an in-court identification of V.B. and J.E. as the two offenders. Banda admitted to previously being a member of the Disciples gang.
Detective Schalk testified that he spoke with V.B. and J.E. at approximately 1:15 a.m. on August 10, 1993. Detective Bogucki and Officer Woods were present during the questioning. Detective Schalk testified that J.E. stated that he and V.B. and six other members of the Stones street gang were riding around. J.E. was carrying a .22-caliber weapon that he found about a week before. They saw a guy who V.B. told him was responsible for having J.E. beaten up about a month before. They approached that guy and V.B. began arguing with him. V.B. then told J.E. to "Pop him, pop him." J.E. said he pulled out the gun and fired twice at the guy. One of the shots struck a boy who was standing next to the guy. J.E. threw the gun into the river.
Officer Schalk also testified that he spoke with V.B. Officers Bogucki and Woods were present for the conversation. V.B. stated that he was riding around with J.E. and eight or nine other members of the Stones street gang. V.B. recognized a man who had let his dog loose on him about a week before. V.B. approached the guy and began arguing with him. J.E. then pulled out a gun. The guy then said, "I dare you to shoot me." V.B. *163 told J.E. to shoot him. J.E. shot at the guy twice. One of the bullets hit the boy next to the guy. V.B. ran from the scene and was later arrested.
At the conclusion of Detective Schalk's testimony, the State rested. At the close of the State's case, J.E. and V.B.'s motion for a directed finding of not guilty was denied.
Jacqueline Delgado (Delgado) testified for J.E. She stated that she overheard a conversation between J.E.'s mother and Ruiz. Delgado stated that Ruiz told J.E.'s mother that J.E. had not been at the scene of the shooting.
Respondents rested their cases. After hearing arguments from counsel, the court found J.E. delinquent based on one count of attempted murder, two counts of aggravated battery, two counts of aggravated discharge of a firearm, one count of armed violence and one count of aggravated assault. The court also found V.B. delinquent based on two counts of aggravated battery and one count of armed violence. Following a dispositional hearing, respondents were committed to the Department of Corrections.

ANALYSIS

I
Respondents first contend that statements they made at the police station after the shooting were not voluntary. The State argues that the trial court's finding that respondents' confessions were voluntary was not against the manifest weight of the evidence. Juvenile defendants are protected by the privilege against self-incrimination, and the burden rests with the State to show by a preponderance of the evidence that a confession was knowingly and intelligently given. People v. Anderson, 276 Ill.App.3d 1, 6, 212 Ill.Dec. 362, 657 N.E.2d 57 (1995). Courts scrutinize custodial interrogation of juvenile suspects with particular care, given that the potential for coercion is enhanced. People v. Brown, 235 Ill.App.3d 479, 490, 176 Ill.Dec. 492, 601 N.E.2d 1190 (1992).
A consideration of voluntariness requires consideration of the totality of the circumstances. People v. Oaks, 169 Ill.2d 409, 446-47, 215 Ill.Dec. 188, 662 N.E.2d 1328 (1996). Voluntariness turns on several factors, including the age, education, and intelligence of the accused, the duration of the questioning, and whether he received his constitutional rights or was subjected to any physical punishment. Oaks, 169 Ill.2d at 447, 215 Ill.Dec. 188, 662 N.E.2d 1328. With juveniles, a court addresses the additional factors of the time of day involved and the presence of a parent or other adult interested in the juvenile's welfare. Brown, 235 Ill.App.3d at 490. 176 Ill.Dec. 492, 601 N.E.2d 1190. The benchmark for voluntariness is not whether the defendant would have confessed in the absence of interrogation, but, rather, whether the defendant's will was overborne at the time of the confession. People v. Brown, 169 Ill.2d 132, 144, 214 Ill.Dec. 433, 661 N.E.2d 287 (1996). The trial judge's ruling will not be disturbed on review unless it is contrary to the manifest weight of the evidence. Brown, 169 Ill.2d at 144, 214 Ill. Dec. 433, 661 N.E.2d 287 (1996).
Respondents argue that the circumstances surrounding their questioning created a coercive environment because they were questioned before any attempts were made to locate their parents. The police do have a statutory duty to contact a minor's parents once he is taken into custody. 705 ILCS 405/2-6(1) (West 1992). If parents indicate an interest by their presence, then they should be allowed to confer with their child before any questioning occurs. In re S.D.S., 103 Ill.App.3d 1008, 1012, 59 Ill.Dec. 258, 431 N.E.2d 759 (1982). However, this does not mean that a parent has to be present every time the police want to question the minor. S.D.S., 103 Ill.App.3d at 1012, 59 Ill.Dec. 258, 431 N.E.2d 759. The parent's presence is an element to be considered in evaluating the voluntary nature of the confession. S.D.S., 103 Ill.App.3d at 1012, 59 Ill. Dec. 258, 431 N.E.2d 759.
In the instant case, respondents were picked up by police shortly after the shooting. The respondents were arrested after being identified in a showup. Officer Kwasinski testified that respondents were given their Miranda rights and questioned on the way to the police station and when they arrived at the police station. The respondents *164 stated that they understood their rights and that they had nothing to do with the shooting. Officer Kwasinski went to J.E.'s house and notified his mother that J.E. was being held at the station. He also attempted to notify V.B.'s parents, but he was unable to contact anyone. Officer Rice testified that the respondents were not questioned on the way to the station and he did not remember if the respondents were questioned in his presence. On the other hand, J.E. testified that he gave the statement before he saw the youth officer and he was not read his Miranda rights. He also testified that he did not ask to see his mother, whom he knew was at the police station. V.B. testified that he also was not read his Miranda rights prior to questioning and there was no youth officer present when he made the statement.
In considering the totality of the circumstances, we do not believe the surroundings created a coercive atmosphere. We take note of the conflicting testimony; however, the trial court resolves questions regarding credibility. People v. Brown, 182 Ill.App.3d 1046, 1051, 131 Ill.Dec. 534, 538 N.E.2d 909 (1989). The trial court found that the testimony of J.E. and V.B. was not credible. We believe that even if respondents were interrogated, they were not questioned extensively about the shooting in the police car or when they arrived at the police station and respondents did not make any incriminating statements at those times. J.E.'s mother was contacted before J.E. made any incriminating statements and attempts to contact V.B.'s parents were unsuccessful. Furthermore, neither J.E. nor V.B. asked to have his parents present during questioning. Also, the officers testified that J.E.'s mother did not request to be present during questioning. The youth officer was present when respondents made their statements and respondents stated that they understood their rights. Therefore, we do not believe that the absence of respondents' parents during questioning created a coercive environment.
J.E. argues that police officers did their best to dissuade his mother from conferring with him and remaining with him during questioning, thereby creating a coercive environment. However, the relevant inquiry is whether the absence of an adult interested in respondent's welfare contributed to the coercive circumstances surrounding the interview, not whether contact with a parent was denied. There is no per se rule that juveniles must be allowed to consult with their parents prior to questioning. Furthermore, the presence or absence of a parent is merely a factor to be considered in determining if the surrounding circumstances were coercive. In re J.O., 231 Ill.App.3d 853, 173 Ill.Dec. 406, 596 N.E.2d 1285 (1992); People v. M.S., 247 Ill.App.3d 1074, 188 Ill.Dec. 53 (1993).
J.E. asserts that the police excluded an interested and present parent from accompanying him until the police elicited a statement from him. He cites In re J.O., 231 Ill.App.3d 853, 173 Ill.Dec. 406, 596 N.E.2d 1285 (1992), to support his assertion. In J.O., the appellate court upheld a circuit court's grant of a 12-year-old respondent's motion to dismiss. The court held that in considering the totality of the circumstances, i.e., respondent's age, the fact that the arrest happened in the middle of the night, the parents' difficulty with the language, and the fact that they were denied access to respondent, respondent's statement was involuntary.
We believe that the instant case is distinguishable from J.O. Here, respondent was 16 years old when he was arrested by the police for the shooting of a 12-year-old boy. Also, the respondent in J.O. was not allowed to confer with any adult interested in his welfare before being questioned. The presence of a youth officer is a crucial factor in favor of finding voluntary waiver. Anderson, 276 Ill.App.3d at 6, 212 Ill.Dec. 362, 657 N.E.2d 57. See People v. Stachelek, 145 Ill.App.3d 391, 99 Ill.Dec. 249, 495 N.E.2d 984 (1986) (statements voluntary although parents of defendant were not notified, but defendant had an opportunity to confer with a youth officer before making a statement); People v. Bobe, 227 Ill.App.3d 681, 169 Ill.Dec. 814, 592 N.E.2d 301 (1992). In the instant case, youth officer Woods was present during the statement J.E. made that *165 was used at the adjudicatory hearing. J.E. was therefore afforded the opportunity to confer with a youth officer, an adult interested in his welfare, prior to making any statement. Officers did not ignore J.E.'s mother's presence, and his mother was in fact "updated" on a regular basis regarding the interrogation of her son. Also, J.E. was given his Miranda rights before giving the statement and stated that he understood each right. In view of these circumstances, we do not believe that the absence of J.E.'s mother while J.E. made the statement contributed to a coercive environment.
V.B. argues that his statement was also involuntary because the record shows that the youth officer failed to take steps to protect his interest. We do not believe that this assertion was supported by the facts or testimony. Before questioning V.B., Officer Woods called a phone number that was listed in V.B.'s records, but there was no answer. V.B. told Officer Woods that his mother was staying with a friend, but he did not know the friend's phone number or address. V.B. was also unable to give Officer Woods the phone number of a grandparent, aunt, uncle, brother or sister. V.B.'s father lived in Florida, but he did not know his father's phone number. After these unsuccessful attempts to contact one of V.B.'s relatives, Officer Woods gave V.B. his Miranda rights, which he stated he understood, and questioned V.B. regarding the shooting. Contrary to V.B.'s assertion, we believe that the youth officer acted appropriately.
J.E. and V.B. also point to physical discomfort as support for their contention that their statements were coerced. They state that they were handcuffed to handcuff rings and guarded by police officers during the four hours between the time they arrived at the station and the time that they gave the statements. They rely on People v. Reed, 123 Ill.App.3d 52, 462 N.E.2d 512, 78 Ill.Dec. 393, (1984), to support their contention. In Reed, the court held that defendant's statement was involuntarily coerced because defendant was periodically questioned for about 36 hours, he was handcuffed to a wall for many hours, the police did not permit normal sleeping conditions, he was denied adequate food while in custody and police failed to honor his numerous requests that questioning cease and to speak to an attorney. Reed, 123 Ill.App.3d at 60-61, 78 Ill.Dec. 393, 462 N.E.2d 512.
We do not believe that the police conduct in the instant case rose to a level of the misconduct of the police in Reed. First, J.E. and V.B. were arrested for the shooting based on identifications at the showup. We believe that it would be reasonable for respondents to be handcuffed and guarded by police once they reached the police station, not only to prevent escape, but also to protect themselves and others in the police station. Furthermore, it does not appear that respondents were handcuffed during the entire four-hour period that they were in the police station. The mere existence of some discomfort is not sufficient to render a statement involuntary. Stachelek, 145 Ill.App.3d at 402, 99 Ill.Dec. 249, 495 N.E.2d 984; People v. Rhodes, 119 Ill.App.3d 1002, 75 Ill.Dec. 741, 457 N.E.2d 1300 (1983).
J.E. and V.B. argue that the cumulative effect of these numerous coercive factors, in addition to the compulsion inherent in custodial detention, so overcame their will as to render the resulting statements involuntary and inadmissible. However, in light of our discussion, we do not believe any factor individually, or cumulatively, created a coercive environment in the instant case. Accordingly, the trial court correctly denied respondents' motions to suppress their statements.

II
V.B. next contends that the trial court lacked jurisdiction to enter a delinquency finding and a dispositional order committing him to the Department of Corrections because his mother was never given proper notice of the motion to suppress hearing. The basic requirements of due process and fairness must be satisfied in juvenile court proceedings. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) To fulfill this requirement, the Juvenile Court Act of 1987 (the Act) requires that the legal guardian or custodian of a juvenile against whom a petition of delinquency is filed be *166 issued a summons by the clerk of the court requiring the guardian or custodian "to appear and answer the petition on the date set for the adjudicatory hearing." (Emphasis added.) 705 ILCS 405/5-15(3) (West 1992).
In the instant case, V.B.'s mother was listed as his custodial parent on the petition for adjudication of wardship. The sheriff attempted to serve summons on the mother at the address that was listed on the petition. However, service was unsuccessful because, according to a neighbor, V.B.'s mother had moved and left no forwarding address. At the hearing on the motion to suppress statements, V.B.'s grandmother was present on two of the days on which the motion to suppress was held. However, the record is not clear whether V.B.'s mother or grandmother was present on the November 15, 1993, hearing on the motion to suppress. We agree with the State that it is not relevant whether V.B.'s mother was present for the motion to suppress hearing because the Act only requires notice for the adjudicatory hearing. V.B.'s mother was present at both the adjudicatory as well as the dispositional hearings. We also note that counsel was appointed as guardian ad litem during the hearing for the motion to suppress.

III
J.E. next contends that he must be granted a new adjudicatory hearing because the trial court excluded both parents from the hearing due to the State's claim that both parents were potential witnesses. The State argues that the trial court did not abuse its discretion because J.E.'s parents were potential rebuttal witnesses. Section 1-5(1) of the Juvenile Court Act states in pertinent part:
"(1) Except as provided in this Section and paragraph (2) of Sections 2-22, 3-23, 4-20 or 5-22, the minor who is the subject of the proceeding and his parents, guardian, legal custodian or responsible relative who are parties respondent have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses * * *." 705 ILCS 405/1-5(1) (West 1992).
In the instant case, prior to the adjudicatory hearing, the State made a motion to exclude witnesses. The defense joined in this motion. J.E.'s answer included the affirmative defense of alibi and listed J.E.'s parents as alibi witnesses. Based on this filing, the State asked that J.E.'s parents be excluded from the courtroom pursuant to the motion to exclude. The court was informed that the defense did not intend to call J.E.'s parents as witnesses. At this point, the State informed the court that it might call them as rebuttal witnesses, depending on the testimony of the other witnesses. Over defense objection, the State added J.E.'s parents to the State's witness list and they were excluded from the courtroom. J.E. argues that according to section 1-5, his parents, who were both parties respondent named in the petition for adjudication of delinquency, had an unqualified right to be present at the proceedings against him. However, the exclusion of witnesses from a courtroom is a matter resting in the sound discretion of the trial court. In re D.L., 226 Ill.App.3d 177, 168 Ill.Dec. 280, 589 N.E.2d 680 (1992). The trial court's exercise of discretion will only be disturbed when clear abuse or prejudice to the respondent is demonstrated. In re Yates, 35 Ill.App.3d 829, 342 N.E.2d 791 (1976).
Two cases, In re Akers, 17 Ill.App.3d 624, 307 N.E.2d 630 (1974), and In re Yates, 35 Ill.App.3d 829, 342 N.E.2d 791 (1976), are instructive on this issue. In Akers, defense counsel moved that witnesses be excluded. The trial court granted the motion. The respondent's parents were named in the petition for adjudication and defense counsel intended to call the mother as an alibi witness for her son. The court then stated that the motion to exclude witnesses would include the parents if they were going to testify, especially as to an alibi. Defense counsel objected, but counsel refused to withdraw his motion to exclude witnesses. The court then adhered to its ruling and excluded the parents. The mother did testify as a witness. The appellate court held that the trial court properly excluded the mother. The court reasoned that there was nothing in the record that suggested that the mother's presence could have been of any particular benefit *167 during the course of the trial nor any incidents cited where she might have counseled and advised her son. The court also held that where the primary function of the mother was to testify as an alibi witness, defense counsel invited the exclusion of the mother from the courtroom. Akers, 17 Ill. App.3d at 626, 307 N.E.2d 630.
In Yates, respondent's counsel offered a motion to exclude all witnesses from the courtroom until they had testified. The court granted the motion. However, respondent argued that the court's order excluding witnesses should not have applied to respondent's sister and legal guardian. The appellate court, relying on Akers, stated that the record did not suggest that the presence of respondent's sister could have been of any particular benefit during the course of the adjudicatory hearing and there was no specific incident cited where the absence of her sister resulted in prejudice to the respondent. Accordingly, the court held that the exclusion of respondent's sister from the courtroom, until she had testified as a witness for respondent, was not an abuse of discretion. Yates, 35 Ill.App.3d at 832, 342 N.E.2d 791.
J.E. distinguishes Akers and Yates from the case sub judice by stating that, unlike the respondents' mother and sister in Akers and Yates, his mother never testified. Therefore, she was never allowed in the courtroom because the State did not call her as a rebuttal witness. However, we do not believe that this distinction is dispositive of this issue. Although J.E.'s parents had a right to participate in the proceeding pursuant to the statute, there is nothing in the record that suggests that the presence of J.E.'s parents could have been of any particular benefit during the course of the trial nor were there any incidents cited where they might have counseled their son. Furthermore, the record indicates that J.E. was adequately represented by able counsel. Accordingly, we conclude that the trial court did not abuse its discretion in excluding J.E.'s parents from the courtroom.
J.E. further argues, however, that Yates and Akers were not decided consistently with section 1-5 in that the section does not list any circumstances under which parents may be excluded. We disagree. The statutory provisions of the Juvenile Court Act protect parents' parental rights that are affected when a court undertakes to declare a minor a delinquent child. Akers, 17 Ill.App.3d at 626, 307 N.E.2d 630. However, a parent's or legal guardian's right to be present at an adjudicatory hearing is not absolute. Yates, 35 Ill.App.3d at 831, 342 N.E.2d 791. Section 1-5(1) does not undermine the court's power to exclude a legal guardian as a witness from an adjudicatory hearing for the purpose of securing uninfluenced testimony. Yates, 35 Ill.App.3d at 831, 342 N.E.2d 791. Conversely, a court order excluding all witnesses, including the legal guardian, does not void or invalidate the entire adjudicatory hearing. Yates, 35 Ill. App.3d at 831, 342 N.E.2d 791.
Lastly, J.E. argues that the exclusion of his parents violated their due process rights to be present at the adjudicatory hearing. J.E. asserts that the result was the same as if they had never been given notice, i.e., they were unable to be present at their son's proceedings. The purpose of a parent's presence is to ensure the juvenile his right to counsel and his right to have his parents present at any hearing. Akers, 17 Ill.App.3d at 625, 307 N.E.2d 630. It is undisputed that J.E.'s parents received proper notice of the adjudicatory hearing. Furthermore, as we previously held, J.E. was not prejudiced by the exclusion of his parents in the courtroom, and, therefore, neither his due process rights, nor those of his parents, were violated.
Pursuant to People v. Nicholls, 71 Ill.2d 166, 15 Ill.Dec. 759, 374 N.E.2d 194 (1978), and People v. Agnew, 105 Ill.2d 275, 85 Ill. Dec. 514, 473 N.E.2d 1319 (1985), we grant the State's request for $150 in costs for defending this appeal and incorporate it as part of our judgment.
For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.
Affirmed.
LEAVITT and GORDON, JJ., concur.