THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHNNY PLUMMER, Defendant-Appellant.

First District (6th Division)   No. 1—95—3400

Opinion filed June 25, 1999.—Rehearing denied July 29, 1999.

Rita A. Fry, Public Defender, of Chicago (Kim L. Sorrells, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Kay Hanlon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE QUINN delivered the opinion of the court:

After a bench trial, defendant Johnny Plummer was found guilty of first degree murder, attempted first degree murder and aggravated battery with a firearm in the death of Michael Engram and sentenced to concurrent terms of 50 years, 25 years and 25 years, respectively. Defendant contends that the trial court's refusal to suppress his confession was against the manifest weight of the evidence because when he became a suspect he was not allowed a meaningful opportunity to confer with his family or an interested adult as mandated in the Juvenile Court Act of 1987 (705 ILCS 405/5—6 (West 1992)).

Prior to trial, defendant filed motions to suppress statements, quash his arrest and suppress evidence. At the various hearings on the motions, the evidence established that at 6:30 p.m. on August 18, 1991, Chicago police detective Michael Kill was at the scene of a homicide at 5817 South Union. Kill was investigating the murder of Anthony Phillips (Phillips), who had been shot to death at 12:30 a.m. on August 18. Kill saw the defendant near the scene and the defendant gave Kill information regarding the shooting. Defendant was a member of the Gangster Disciples street gang, as was Phillips. They had been together at a party shortly before the shooting. After the conversation, Kill allowed defendant to leave the scene.

At 3:30 a.m. on August 19, Kill was again near the scene of the homicide, talking to two other witnesses on the porch at 5933 South Union. While Kill was speaking to these two witnesses, defendant walked by. Kill asked defendant to accompany him to the police station along with the other witnesses. Kill testified that because defendant was a juvenile, Kill drove to defendant's home at 5708 South Marshfield to inform his mother where they were going. Kill knocked on the door and a woman answered. Kill asked the woman if she was defendant's mother and she said she was. Kill told the woman that defendant had agreed to accompany him to Area Three to assist in the investigation of the murder of Anthony Phillips.

At the police station, the three witnesses were placed in separate interview rooms where they each gave statements about the Phillips homicide. Defendant was not handcuffed and was not advised of his rights under *Miranda* as he was not a suspect. Defendant was

interviewed at approximately 6 a.m.. Defendant told Kill and Detective John Halloran (Halloran) that Lamont Lake had shot Phillips. Halloran then told all three witnesses that he and other police were leaving Area Three to pick up Lake, who lived at 5540 South Union. Halloran testified that he told the witnesses that they could go home but that they would have to return to the police station if Lake was picked up in order to view any lineup. All three witnesses agreed to wait in the police station for the detectives to return. Halloran returned at 3 p.m. with another witness to the Phillips shooting.

On the morning of the same day, Detective Stanley Turner received an anonymous telephone call telling him that a tall, young black man with a dark complexion named "Smokey" from 59th Street was responsible for the murder of Michael Engram. Engram had been shot to death on August 11 at 60th Street and Morgan. Around 4 p.m. Turner learned that an individual named "Smokey" from 59th and Union Streets was in the station assisting police with a different murder investigation. The detective then met with defendant, advised him of his *Miranda* rights and spoke to him for about 15 minutes. Defendant admitted that his nickname was "Smokey" and that he lived around 59th Street, but he denied any knowledge of the Engram murder. During the conversation defendant was not handcuffed and appeared relaxed and coherent. The detective testified that at that time he did not know defendant's age and did not attempt to contact his family because he was not in custody but was there as a witness.

At 6 p.m. on the same day, Detectives Kill and Kenneth Boudreau again spoke to defendant about the Phillips murder. After asking defendant and the other two witnesses if they would remain in the station in the event any suspects were found, the officers left the station. Detective Kill testified that at the time he was not aware that defendant's nickname was "Smokey" or that he was a suspect in the Engram murder. The detective denied treating defendant in an abusive manner and stated that defendant never asked to see a lawyer or his mother. He further testified that defendant appeared to have good presence of mind and answered all of his questions clearly.

At 7 p.m. Detective Halloran returned to the police station bringing food for the witnesses. While he was talking to Detectives Ball and Anderson, they told him that they had an eyewitness to the Engram murder and requested that defendant stand in a lineup. Halloran denied treating defendant in an abusive manner or having any contact with him regarding the Engram case. He testified that defendant appeared to have no difficulty understanding him and did not ask to speak to anyone.

At 8:30 p.m. defendant stood in a lineup and was positively identi-

fied as Engram's killer. Afterward, Detective Anderson spoke with defendant for the first time, advising him of his *Miranda* rights and that he could be tried as an adult for Engram's murder. After arresting defendant, Anderson asked defendant if he wanted to call his mother. The detective attempted to reach her but was unsuccessful. Then, after a 20-minute conversation with defendant, he notified a youth officer and the felony review unit of the State's Attorney's office. About 11:15 p.m. on August 19, youth officer Frank McCall, Detective Anderson and Assistant State's Attorney Marback spoke to defendant. McCall testified that he introduced himself to defendant and said he was a youth officer. McCall was present for all subsequent interviews. Marback introduced himself, explained that he was not defendant's lawyer and advised him of his *Miranda* rights and that he could be tried as an adult. After indicating that he understood his rights, defendant confessed to the Engram murder and agreed to give a handwritten statement. At 12:35 a.m. on August 20, Marback again advised defendant of his *Miranda* rights and then proceeded to write out defendant's statement in defendant's presence. At the conclusion of the statement, defendant read out loud the *Miranda* portion of the statement as well as the first few lines of the statement. Marback read the rest of the statement out loud and defendant appeared to read along. Defendant made corrections to the statement, everyone present initialed the corrections and then defendant signed the statement. Afterward, defendant asked to add something to the statement which Marback transcribed. Everyone then signed the addition to the statement. Detective Anderson and Officer McCall both testified that during their conversation with defendant he appeared to understand their questions and his responses were appropriate. They also testified that defendant never indicated that he had been mistreated, struck or otherwise coerced into giving a statement. Detective Anderson denied taking defendant's shoes and claiming that they matched prints found at the scene of the crime. Officer McCall did not ask defendant if he wanted to speak to a family member because he had been told by another officer that defendant's mother had been contacted. McCall testified that defendant had 12 prior contacts with the police.

At 3:50 a.m. on August 20, 1991, defendant gave a witness statement to Marback and Detective Halloran regarding the Phillips murder.

At one of the hearings on his motions, defendant testified that between 9 and 10 a.m. on August 18, 1991, two detectives took him to a police station where he was placed in a small room and handcuffed to a ring in the wall. His mother was not with him nor did he call her or any of his family members while he was there. He was living with his

aunt at 57th and Marshfield at that time. He denied that Detective Kill took him to his mother's house before bringing him to the station. About six hours later, defendant was taken to the scene of Anthony Phillips' homicide. Later, he was returned to the police station, where he was given a hamburger. When he asked to go home or see his mother or a lawyer, Detective Kill laughed, hit him in the face, the stomach and in the side, pulled his hair and left the room. Another detective came to take his shoes and then claimed that the shoes matched the prints from the scene. Another officer told defendant he would get 40 years in prison, where he would be raped. After that, he never left the station prior to making his statements on August 20.

Defendant stated that he only made his statements because he was told that he could go home if he would do so and because he was tired and afraid. Defendant believed that he was in police custody from the time he entered the police station. On cross-examination, he admitted that he was not handcuffed when he spoke with Detective Foley regarding the Phillips case and that he never told him that he wanted to go home. He stated that he cooperated with the investigation because he and Phillips had been in the same gang. He testified that he agreed to go to the crime scene with Detective Kill. However, when they returned to the station from the crime scene, Detective Kill and another officer accused him of murdering Phillips. He testified that he was never advised of his rights by any of the police officers, but he did admit that the assistant State's Attorney gave him his rights prior to his witness statement and that a youth officer had been present. Defendant stated that "about a half day" after he gave his witness statement, Detective Kill hit him once in the face and three times with a flashlight.

After giving the witness statement on the Phillips homicide, defendant recalled standing in a lineup and learning that he was identified in the Engram murder, but he did not recall police ever advising him of his rights before he spoke to them about the murder. He admitted that the assistant State's Attorney advised him of his rights before he gave a written statement about the Engram murder. He stated that he did not know what was in the statement, but he signed it because he was afraid and tired of being in the police station. He testified that he signed that statement after he signed the witness statement regarding the Phillips murder. He testified that when he was taken to the juvenile temporary detention center on August 20, he told the doctor there that the police had beaten him. However, when shown photographs taken of him during the lineup, he admitted that there were no marks on his face.

Defendant's mother, Jeanette Plummer, testified that at the time

of her son's arrest she resided at 5229 South Marshfield and no police officer had come to tell her that her son was being taken to the station. She stated that defendant did not live with her but with his aunt at 57th and Marshfield. This had developed because defendant had been hospitalized for a suicide attempt and upon his release a doctor advised that it would be better for him to live away from his mother. Defendant's mother testified that she was unsure of the date, but believed it to be on August 20, 1991, between 8 and 9 p.m., she received a phone call from a person who identified himself as a police officer. The officer asked if she was defendant's mother and, upon being told that she was, the officer said her son was at the police station "on a murder charge." Defendant then got on the phone and said that he was at the police station and that "they got me down here for murder." Defendant's mother did not testify as to any further conversation with defendant. She did testify that she talked to the police officer who placed the call and was told there was no need for her to come to the police station. On the following day she visited defendant at the Audy Home, where she observed that his back and face were swollen, and he had dark marks on his upper chest. Defendant told her that he had been beaten by the police. On cross-examination, defendant's mother admitted that the lineup photos of defendant did not show any injuries.

Dr. Lawrence Heinrich, a clinical psychologist, testified that after he met with defendant during the spring of 1993, performed a battery of tests and reviewed prior medical reports, he determined that defendant suffered from schizo-affective disorder. In his opinion, stress and prolonged interrogation would cause defendant to do anything to escape the situation, although he would not understand what he was doing. The doctor admitted that he did not speak with anyone who knew defendant prior to his arrest other than defendant's mother. He also admitted that at times defendant did not tell the truth. Heinrich testified that he was unaware of defendant's prior contacts with juvenile authorities, two of which resulted in probation. He testified that defendant understood the serious nature of the charges against him. He did not testify as to whether defendant could understand and waive his rights under *Miranda*.

For the State, in rebuttal, Dr. Albert Stipes, a psychiatrist, testified that he met with defendant on July 20 and November 20, 1992. After reviewing police reports, defendant's statements and his social and psychiatric history, the doctor determined that defendant could knowingly and understandingly waive his *Miranda* rights, that he was fit and sane at the time of the incident, and there was no evidence of a schizo-affective disorder. He also stated that he believed that defen-

dant was malingering and exaggerating or faking the symptoms of mental illness. Dr. Stipes testified that he reviewed a report by another psychologist at the Psychiatric Institute which also concluded defendant was malingering. Dr. Stipes also testified that in 1984 the defendant had an IQ test which reflected an IQ of 97. He testified that when Dr. Messina of the Psychiatric Institute attempted to administer an IQ test to defendant in 1992, she determined defendant was malingering and was purposely attempting to get a low score.

The trial court denied defendant's motion to quash his arrest and suppress evidence, finding that defendant went to the police station voluntarily and was not arrested until after the lineup. The court also denied defendant's motion to suppress statements, determining that he had not been physically, psychologically or emotionally coerced.

At trial, the evidence established that at 1 p.m. on August 11, 1991, Roger Taylor observed defendant, whom he knew as "Smokey," running toward 60th Street with a gun in his hand. After defendant entered a basement candy store at 60th and Morgan Streets, Taylor heard three gunshots. He then saw defendant run out of the store and down the street, changing his shirt as he ran. Reiko Dyson and her three-year-old son D'Andre were in the store with the victim, Michael Engram, when defendant entered the store with a gun in his hand and opened fire. The victim, who was unarmed, was shot in the head and chest and D'Andre was wounded in the finger. On August 19, 1991, Dyson identified defendant in a lineup.

Assistant State's Attorney Marback then testified that defendant gave a handwritten confession to the Engram murder in which he stated that he had known the victim for two years, they both belonged to the Gangster Disciples street gang and they sold drugs for the gang. Three days before the shooting they had an argument about drugs during which the victim threatened defendant. Fearful, defendant purchased a .45-caliber gun and ammunition. On August 11, 1991, defendant went to the candy store with the gun in his waistband. There, the victim told him that he should beat him up and he began to walk toward defendant. Although he did not see anything in the victim's hands, defendant backed away, pulled his gun and shot five or six times at the victim. He then fled to an abandoned building at 59th and Union Streets, where he hid the gun. After defendant completed his statement to the assistant State's Attorney, he added a paragraph in which he wrote that two individuals had witnessed his drug-related argument with the victim, and another individual, named Aaron Scott, had told him that the victim "had a hit" on defendant. It was because of the "hit" that defendant shot the victim.

Officer Bembynista testified that he recovered shell casings and a

bullet from inside the candy store. He also picked up bullets taken from the victim's body during treatment at Cook County Hospital. The parties stipulated that firearms examiner James Treacy examined the shell casings and recovered bullets and they were all .45 caliber. The cause of death was multiple gunshot wounds. After arguments, the trial court found defendant guilty of first degree murder, attempted first degree murder and aggravated battery with a firearm and sentenced defendant to concurrent prison terms of 50 years, 25 years and 25 years, respectively.

On appeal, defendant contends that the trial court erred in denying his motion to suppress statements where the evidence established that he was denied access to his mother and family once his status changed from witness to suspect, the youth officer failed to perform his duties to safeguard defendant's rights and there was medical evidence that he was easily susceptible to the influence of others.

Section 5—6(2) provides:

> "(2) A law enforcement officer who takes a minor into custody without a warrant under Section 5—5 shall, if the minor is not released, immediately make a reasonable attempt to notify the parent or other person legally responsible for the minor's care or the person with whom the minor resides that the minor has been taken into custody and where the minor is being held; and the law enforcement officer shall without unnecessary delay take the minor to the nearest juvenile police officer designated for such purposes in the county of venue or shall surrender the minor to a juvenile police officer in the city or village where the offense is alleged to have been committed." 705 ILCS 405/5—6 (West 1992).

■ The State contends that section 5—6(2) does not apply to the defendant, because he was in custody as a murder suspect and was, therefore, not a "delinquent minor" who benefits from the protection of the Act. Section 5—5(1)(a) of the Act, to which section 5—6(2) refers, provides that "[a] law enforcement officer may, without a warrant, take into temporary custody a minor *** whom the officer with reasonable cause believes to be a delinquent minor." 705 ILCS 405/5—5(1)(a) (West 1992). Section 5—3(1) of the Act defines "[d]elinquent minor" as "any minor who prior to his 17th birthday has violated *** any *** state law." 705 ILCS 405/5—3(1) (West 1992). The State correctly notes that section 5—4(6)(a) states that "[t]he definition of delinquent minor under Section 5—3 of this Act shall not apply to any minor who at the time of an offense was at least 15 years of age and who is charged with first degree murder ***. These charges and all other charges arising out of the same incident shall be prosecuted under the Criminal Code of 1961." 705 ILCS 405/5—4(6)(a) (West 1992).

The State cites three cases as authority for the proposition that the Juvenile Court Act does not apply to juveniles whose homicide cases are heard in the circuit court because they were 15 years old or older when charged with homicide. *People v. Daniel,* 238 Ill. App. 3d 19, 33, 606 N.E.2d 94 (1992) (Juvenile Court Act of 1987 does not apply to 16-year-old defendant charged with murder as he is subject to the jurisdiction of the circuit court); *People v. Sevier,* 230 Ill. App. 3d 1071, 1084, 598 N.E.2d 968 (1992) (same holding); *People v. Green,* 179 Ill. App. 3d 1, 13, 535 N.E.2d 413 (1988) (same holding). In reaching these results, the courts in *Daniel, Sevier* and *Green* all relied on *People v. Visnack,* 135 Ill. App. 3d 113, 481 N.E.2d 744 (1985). However, the defendant in *Visnack* was already 17 years old at the time he committed murder. Accordingly, he was not subject to the terms of the Juvenile Court Act due to his age. See Ill. Rev. Stat. 1979, ch. 37, par. 702—7. When the court in *Visnack* held that the Juvenile Court Act did not apply to the 17-year-old defendant, the holding was correct, but not for the stated reason that the Juvenile Court Act does not apply to juveniles who are subsequently charged with murder. A close reading of *Sevier* reveals that the defendant in that case was also 17 at the time of the crime.

The holdings in *Daniel, Sevier* and *Green* are based on unfounded applications of the holding in *Visnack* to juveniles under 17 who are subsequently charged with murder.

This misapplication of the holding in *Visnack* was first noted in *People v. Pico,* 287 Ill. App. 3d 607, 678 N.E.2d 780 (1997). In *Pico,* the court focused on the language of section 5—4(6)(a) which exempted from the protections of the Juvenile Court Act " 'any minor who at the time of an offense was at least 15 years of age and *who is charged* with first degree murder.' " (Emphasis in original.) 287 Ill. App. 3d at 611-12, quoting 705 ILCS 405/5—4(6)(a) (West 1994). The court held that "the plain language of section 5—4(6)(a) indicates that its exemption is triggered only when the minor has been charged. Until that point, the minor retains the protection of the [Juvenile Court] Act. This is the only logical interpretation of section 5—4(6)(a), for until such time as the minor is charged, the State cannot know whether he will be tried pursuant to the Criminal Code as an adult or as a delinquent minor under the [Juvenile Court] Act." *People v. Pico,* 287 Ill. App. 3d at 612.

■ We agree with the analysis and holding of *Pico* and adopt it, and reject the holdings in *Daniel, Sevier* and *Green.* Accordingly, we hold that, under section 5—4(6)(a), a minor being held in custody pursuant to section 5—5 does not lose the protection of the Juvenile Court Act until such time as he is charged with one of the offenses

enumerated in section 5—4(6)(a). In this case, defendant was not charged with murder at the time he was being questioned. Therefore, he was only a possible delinquent minor at the time he was questioned and section 5—6(6)(a) of the Act applied.

■ This having been said, a reviewing court does not reweigh the evidence when deciding whether the trial court properly denied a motion to suppress—a motion to suppress will be reversed on appeal only when it is shown that the trial court's determination was against the manifest weight of the evidence. *People v. Brown*, 169 Ill. 2d 132, 144, 661 N.E.2d 287 (1996). Each case must be evaluated based on its own particular set of circumstances. *People v. Bernasco*, 138 Ill. 2d 349, 562 N.E.2d 958 (1990).

■ Juvenile defendants are protected by the privilege against self-incrimination, and the burden rests with the State to show by a preponderance of the evidence that a confession was knowingly and intelligently given. *People v. Anderson*, 276 Ill. App. 3d 1, 6, 657 N.E.2d 57 (1995). Courts scrutinize custodial interrogation of juvenile suspects with particular care, given that the potential for coercion is enhanced. *In re J.E.*, 285 Ill. App. 3d 965, 974, 675 N.E.2d 156 (1996). A confession will be admissible only if it was made freely and voluntarily and if no direct or implied promises were made or improper influence applied. *People v. Fuller*, 292 Ill. App. 3d 651, 653, 686 N.E.2d 6 (1997). Even when a juvenile is concerned, however, a court looks to the totality of the circumstances to determine whether a confession is voluntary. *People v. McNeal*, 298 Ill. App. 3d 379, 390, 698 N.E.2d 652 (1998).

Factors to be considered when determining voluntariness are: the defendant's age, education, intelligence, experience, and physical condition; the duration of the questioning; whether he was advised of his constitutional rights; whether he was subjected to any threats, promises, or physical or mental coercion; and whether the confession was induced by police deception. *People v. Oaks*, 169 Ill. 2d 409, 447, 662 N.E.2d 1328 (1996).

For a juvenile there are some additional considerations: the time of day when questioning occurred and the presence or absence of a parent or other adult interested in the minor's welfare. *People v. McNeal*, 298 Ill. App. 3d at 391. The benchmark for voluntariness is not whether the defendant would have confessed in the absence of interrogation but, rather, whether the defendant's will was overborne at the time of the confession. *People v. Brown*, 169 Ill. 2d at 144.

■ Defendant argues that the circumstances surrounding his questioning created a coercive atmosphere because he was denied access to his mother and family once his status changed from witness to suspect, the youth officer failed to perform his duties to safeguard

defendant's rights and there was medical evidence that he was easily susceptible to the influence of others.

Detective Kill initially spoke with defendant regarding the Phillips homicide at 6:30 p.m. on August 18 near the murder scene. Kill allowed defendant to leave the scene after talking to him. At 3:30 a.m. on August 19, Kill was again near the scene speaking to two witnesses when defendant approached. Defendant agreed to accompany Kill, who then took defendant to his home at 5708 South Marshfield. Kill notified the woman there that defendant was going to be in Area Three talking to the police about a murder investigation. It appears from the record that this woman was defendant's aunt, not his mother. However, on appeal, defendant concedes that this notice was proper as the aunt was "the person with whom the minor resides" as allowed under the Juvenile Court Act. 705 ILCS 405/5—6 (West 1992). This action of taking defendant to the police station as a witness to the Phillips homicide was clearly not a ruse as defendant gave several statements to the police concerning his knowledge of that shooting, in which defendant was not a suspect. See *People v. Rhonda F.*, 289 Ill. App. 3d 148, 155-56, 682 N.E.2d 225 (1997) (for a discussion of a similar fact pattern). While defendant was at Area Three as a witness in the Phillips homicide, other detectives developed information that made defendant a suspect in the Engram homicide. He was briefly questioned and denied any knowledge of it. Some four hours after this denial, defendant was placed in a lineup relating to the Engram homicide and was identified. Defendant testified that he willingly cooperated with the police as to the Phillips homicide, signing a witness statement. Defendant testified that he was identified in the Engram lineup and beaten by the police "about half a day" after signing the Phillips witness statement. In fact, the statements show that defendant gave his statement on the Phillips case three hours *after* he confessed to the Engram homicide.

The police testified that, after the lineup, defendant was arrested for the Engram homicide. Detective Anderson testified at the motion to suppress that he attempted to contact defendant's mother by phone at this time, to no avail. Section 5—6(2) provides that the police must "make a reasonable attempt" to notify the parents that the minor has been taken into custody and where the minor is being held. 705 ILCS 405/5—6(2) (West 1992). Even though Anderson complied with this requirement, we consider the absence of defendant's mother or aunt as a factor in favor of defendant's argument. However, the trial court found that there was no evidence "whatsover" that the police coerced defendant physically, psychologically or emotionally. Likewise, we do not find that the police conduct in this case was comparable to the

extreme circumstances in *People v. Montanez*, 273 Ill. App. 3d 844, 652 N.E.2d 295 (1995), and *People v. Brown*, 235 Ill. App. 3d 479, 601 N.E.2d 1190 (1992).

We next address defendant's assertion that youth officer McCall failed to perform his duties to safeguard defendant's rights. McCall testified at the motion to suppress statements that he met defendant after he had been identified in the lineup. McCall introduced himself to defendant as a youth officer. He was told that another officer had contacted defendant's mother, although this appears to be untrue. He was present during an interview conducted by Assistant State's Attorney Marback. He noted that Marback read defendant his *Miranda* rights and his juvenile rights. He noted that defendant was in an interview room and was not handcuffed. He testified that defendant appeared to be comfortable and able to understand his rights. He testified that no one abused defendant in his presence, that defendant did not appear to have been abused, and that defendant did not complain of abuse. McCall testified that he had been a youth officer for 18 years and it was his duty to "protect the rights of a youth."

Although the presence of a youth officer does not *per se* make a juvenile's confession voluntary, it is a significant factor. *People v. Fuller*, 292 Ill. App. 3d at 665, citing *In re Lashun H.*, 284 Ill. App. 3d 545, 557, 672 N.E.2d 331 (1996). The Juvenile Court Act does not require that the minor be seen by a youth officer before questioning. *People v. McNeal*, 298 Ill. App. 3d 379 (1998).

Since this case was heard at oral argument, three cases have criticized the action, or inaction, of youth officers during interrogations. In *In re G.O.*, 304 Ill. App. 3d 719 (1999), the court noted that while the defendant was interviewed in the presence of youth officers, the court found

> "no indication either youth officer ever said anything to G.O. Their presence was useless. See *J.J.C.*, 294 Ill. App. 3d at 237.
>
> The youth officers simply were more police officers questioning a 13-year-old who never before had been arrested. The statutory purpose behind the requirement that a youth officer be notified was defeated. See *Fuller*, 292 Ill. App. 3d at 667." *In re G.O.*, 304 Ill. App. 3d at 733.

In *In re L.L.*, 295 Ill. App. 3d 594, 693 N.E.2d 908 (1998), the court, in finding that the trial court's decision not to suppress the respondent's incriminating statement was against the manifest weight of the evidence, pointed out: "Furthermore, the record and the comments of the trial court show that no youth officer demonstrated any interest in the minor's welfare. Rather, the relationship of the youth officer appears to have been adversarial and antagonistic toward re-

spondent." *In re L.L.*, 295 Ill. App. 3d at 603. In *In re J.J.C.*, 294 Ill. App. 3d 227, 689 N.E.2d 1172 (1998), the court suppressed a juvenile's confession, noting: "Mueller, the youth officer, was present; however, the record is silent of indicia on the part of the youth officer affirmatively protecting respondent's rights." *In re J.J.C.*, 294 Ill. App. 3d at 237.

While we acknowledge these decisions, we are also mindful of authority holding to the contrary. In *People v. Fuller*, 292 Ill. App. 3d 651, 667, 686 N.E.2d 6 (1997), the court found that while the defendant's first confession made in the absence of a youth officer was inadmissible, the second confession made in the presence of a youth officer was admissible. In *In re J.E.*, 285 Ill. App. 3d 965, 977, 675 N.E.2d 156 (1996), the court affirmed the voluntariness of a statement in spite of the defendant's assertion that the youth officer failed to take steps to protect his interest. The court disagreed, noting that the youth officer unsuccessfully attempted to contact the respondent's mother by phone. The youth officer then read the respondent his *Miranda* rights and questioned the respondent regarding the shooting. The court held: "Contrary to V.B.'s assertion, we believe that the youth officer acted appropriately." *In re J.E.*, 285 Ill. App. 3d at 977. In *People v. Gardner*, 282 Ill. App. 3d 209, 217-18, 668 N.E.2d 125 (1996), the court affirmed the voluntariness of a juvenile defendant's confession, saying that even if the appellate court believed the defendant's grandmother's testimony that police refused to let her see her grandson while she was at the police station, the confession was voluntary under the totality of the circumstances and a major factor in this decision was the fact that a youth officer was present during the interrogation. In *In re D.C.*, 244 Ill. App. 3d 55, 63, 613 N.E.2d 1139 (1992), the court affirmed the admissibility of a juvenile's confession made in the presence of a youth officer even though the officer did not even identify himself to the juvenile. The holdings in all of the aforementioned cases demonstrate that these cases are very fact specific and each case must be evaluated on its own particular set of circumstances. *People v. Bernasco*, 138 Ill. 2d 349, 562 N.E.2d 958 (1990).

Two older cases have addressed the proper duties of a youth officer. In *People v. Brown*, 182 Ill. App. 3d 1046, 538 N.E.2d 909 (1989), the court held that police officers who know of a parent's presence in a police station have an affirmative duty to inform those actually questioning a juvenile of the parent's presence and those officers actually questioning the juvenile have an affirmative duty to then stop the questioning and allow the parent to confer with the child. *People v. Brown*, 182 Ill. App. 3d at 1053-54. In *People v. Bobe*, 227 Ill. App. 3d

681, 592 N.E.2d 301 (1992), the court reviewed the actions taken by a youth officer who was present for an interrogation of a juvenile. The officer testified that her " 'function' " was " '[t]o be sure that he [the defendant] was advised of his rights and to be advised that because of the seriousness of the crime, that he could be tried as an adult.' " *People v. Bobe*, 227 Ill. App. 3d at 701-02. The court concluded that the police followed the Juvenile Court Act when the youth officer was present to "monitor" the interview. The court went on to conclude that there was nothing in the Juvenile Court Act requiring that a youth officer be present when a minor is questioned. *People v. Bobe*, 227 Ill. App. 3d at 702.

■ Consistent with the holding in *Brown*, youth officers should be required to verify whether a juvenile's parent or other significant adult has been notified of the presence of the juvenile and to determine if the parent wishes to confer with the juvenile prior to questioning. If the parent indicates he or she wishes to confer with the juvenile, the youth officer should see that questioning ceases until they can confer. Consistent with the holding in *Bobe*, youth officers should be required to verify with the juvenile that he has been given his rights under *Miranda* and understands that he may be tried as an adult if that is the case. Consistent with common sense, youth officers should be required to see to it that juveniles are properly treated—that they are fed, allowed to rest if needed, given access to washroom facilities, are not held in a confined space with adult suspects, and that they are not coerced in any way.

Taking all of this as true, however, it is still the law in Illinois that a youth officer need not even be present before or during questioning of a minor. *People v. McNeal*, 298 Ill. App. 3d 379, 391, 698 N.E.2d 652 (1998). As a result, any real defining of the duties of youth officers will need to be done by the police agencies themselves. Those agencies should keep in mind that the totality of the circumstances test which our courts apply to determine whether a confession is voluntary is broad enough for all of the suggested factors and more to be taken into consideration.

■ Finally, defendant asserts that the medical evidence he presented demonstrated that he was easily susceptible to the influence of others, and therefore his confession should have been suppressed. Dr. Heinrich did testify that defendant suffered from a schizo-affective disorder. However, Dr. Stipes testified for the State that defendant did not suffer from such a disorder and that he could knowingly and understandably waive his *Miranda* rights. Dr. Stipes further found that defendant was malingering and exaggerating or faking the symptoms of mental illness. This finding was based in part on the

reports of two other psychologists who found defendant to be a malingerer. The trial court was not required to accept the testimony of one expert over that of another. It is well established that the credibility and weight to be given psychiatric testimony are to be determined by the trier of fact. *People v. McMillen*, 281 Ill. App. 3d 247, 250, 666 N.E.2d 812 (1996).

For all of the above reasons, considering the totality of the circumstances, we cannot say the trial judge's ruling admitting the confession was against the manifest weight of the evidence.

Therefore, we affirm the defendant's conviction and sentence.

Affirmed.

GREIMAN, P.J., and THEIS, J., concur.